1  M. VAN SMITH (SBN 32007)
2  1696 Mendenhall Drive
   San Jose, California 95130
3  Telephone (408) 364-1062

4  Attorney for Plaintiff,
5  MITCHELL J. Pearce, DC, MS, L.Ac.

6

7              THE UNITED STATES DISTRICT COURT

8         FOR THE NORTHERN DISTRICT OF CALIFORNIA

                    SAN JOSE DIVISION
9

10 MITCHELL J. PEARCE, D.C., M.S.,        Case No. _____
   L.Ac.,
11            Plaintiff,                   COMPLAINT FOR SPECIAL,
                                           GENERAL, AND PUNITIVE DAMAGES
12                                         FOR AND FROM:

13            vs.
                                           1)  VIOLATION OF CIVIL RIGHTS;
14 CAROL ROMEO;  JAMES SHARP;              2)  CONSPIRACY TO VIOLATE CIVIL
   WILBUR BENNET; VIVIEN HERSH;                RIGHTS;
15 LYDIA ZANE; JOEL PRIMES; R.             3)  FAILURE TO ABATE
   LLYOD FRIESEN, D.C.; MICHAEL                CONSPIRACY TO VIOLATE
16 MARTELLO, D.C.; LLOYD E.                    CIVIL RIGHTS;
17 BOLAND, D.C.; DEBORAH E.  PATE,         2)  MALICIOUS PROSECUTION
   D.C.; JOHN BOVEE; ROSA MEI LEE;         3)  ASSAULT AND BATTERY
18 SHARON UFBERG, D.C.; JEFFREY            4)  FALSE ARREST and
19 STEINHARDT, D.C.; STEPHEN                   IMPRISONMENT
   FOREMAN, D.C., JACALYN                  5)  VIOLATION OF CALIFORNIA
20 BUETTNER, D.C.; CRAIG                       CIVIL CODE SECTION 52.1
21 MISSAKIAN, J.D.; JOHN DERONDE,          6)  DAMAGES PURSUANT TO
   D.C.; VIVIAN DAVIS; M.  ELIZABETH           CALIFORNIA CIVIL CODE
22 WARE; ROBERT BOURKE; GAYLYN                 SECTION 52
   MACHADO; DAVID BRUCE LOVE,              7)  CIVIL VIOLATION OF THE
23 D.C., SUSAN LEVIN; DENINE GUY;              RACKETEER INFLUENCED
24 DAVID FULTON; ROBERT YONTS;;                AND CORRUPT
   C.  BRETT SULLIVAN, D.C.;                   ORGANIZATIONS ACT OF
25 WINIFRED BOTHA; RICHARD                     1970;
26 ALEXANDER; LAWRENCE MERCER;
   PETER BERMAN, Ph.D.; PATRICIA         AND FOR TREBLING OF DAMAGES
27 BRICKMAN; LYNDE SCHEFFER,                 FOR VIOLATION OF THE

28
                              **1**
   _____

        **COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**RACKETEER INFLUENCED** **AND CORRUPT**
**D.C.; UNKNOWN PEACE OFFICER;** **ORGANIZATIONS ACT;**
**UNKNOWN CHIROPRACTIC BOARD**
**OFFICER; and UNKNOWN AG** **AND FOR RECOVERY OF**
**AGENT - ALL IN THEIR INDIVIDUAL** **ATTORNEYS FEES AS**
**CAPACITIES and YONTS & FULTON** **ALLOWED BY 42 U.S.C.**
**A LAW FIRM** **SECTION 1988 AND 18 U.S.C.**
**1964(c)**

        **Defendants.**

        **DEMAND FOR JURY TRIAL**

_____/

Plaintiff alleges:

## JURISDICTION AND VENUE

1.    Plaintiff alleges a civil action under the Civil Rights Act of 1871, as amended, also known as 42 U.S.C. sections 1983, 1985, 1986, and 1988, hereinafter "section 1983", "section 1985", "section 1986", and "section 1988", respectively.  The Civil Rights Act of 1871, as amended authorizes United States District Courts to hear civil actions brought under the act.  Plaintiff also alleges an action under Title IX of the Organized Crime Control Act of 1970, Public Law 91-452, 84 Stat.  922, popularly known as the RICO Act and encoded as 18 U.S.C. 1961 et seq.  Plaintiff makes this claim under authority of section 1964(c) of said code.  18 U.S.C. 1964(c) authorizes the United States District Courts to hear civil actions brought under this section.  Because the State Law claims alleged herein arise out of the same nexus of facts as the federal claims alleged herein, this court has pendente lite jurisdiction over the State Law Claims alleged herein.

2.    Venue is proper in the Northern District of California under 28 U.S.C. Section 1391(b)(2) because the substantial portion of claims alleged herein arose within said district.  For the RICO claims asserted herein, venue is properly

**2**

_____

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

reposed in the Northern District of California under 18 U.S.C. 1965(a) and (b) because the majority of defendants reside or were found within this district at the time the claim arose and because the ends of justice require that the parties not residing within this district be brought before this court.

**INTRADISTRICT ASSIGNMENT**

3.    The bulk of the claims alleged herein arose in the County of Santa Clara, State of California.  Plaintiff was injured in his business domiciled in Santa Clara County, State of California.  Claims for damages under California Civil Code section 52.1, are to be brought in the county in which the violation of said code occurred.  As more fully alleged below, violations of California Civil Code section 52.1 occurred in Santa Clara County.

**FACTS COMMON TO ALL CLAIMS**

4.    In 1981 plaintiff Mitchell J. Pearce, D.C., M.S., L.Ac. ("Dr. Pearce") graduated from Palmer College of Chiropractic.  In 1982 California and Massachusetts licensed Dr. Pearce to practice chiropractic.  In 1983 Dr. Peace became certified in Disability Evaluation in Workers Compensation.  In 1984 Dr. Pearce became certified in Independent Medical Examination in workers compensation cases, and in 1990 Dr. Pearce became certified in Industrial Disability Evaluation.  In 1991, Dr. Pearce was appointed to be a Qualified Medical Evaluator for the State of California Department of Industrial Relations. From 1982 till 1999, Dr.  Pearce was engaged in interstate commerce by billing for services to out of state insurance companies and by providing chiropractic services in both Massachusetts and California.

5.    State Fund Compensation Insurance ("SFIC") was the worker's compensation insurer for a worker's compensation claim that had been filed by Gaylyn Stuart, f.k.a Machado ("Stuart").  Sovy Medved ("Medved"), an insurance adjustor for SFIC referred Stuart to Dr. Pearce for a medical evaluation of her

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

claimed industrial injury.  On August  6, 1991, Gaylyn Machado came to Dr. Pearce's office for the evaluation.  Medved had asked plaintiff to determine if chiropractic care was appropriate for Stuart's complaints of back pain, leg pain, numbness, inability to tell when she needed to urinate, and constipation.  Stuart brought, with her, a report of a muscle-strength test performed on July 29, 1991 by David Bruce Love, D.C. ("Love"), her treating chiropractor.  This report stated Stuart had the following strengths in her spinal muscles measured in pounds:

| Cervical right lateral flexion: | 2.2 | Lumbar right lateral flexion: | 8.9 |
| Cervical left rotation: | 2.2 | Lumbar left rotation: | 3.2 |
| Cervical right rotation: | 2.2 | Lumbar right rotation: | 5.7 |
| Cervical extension: | 2.7 | Lumbar extension: | 5.6 |
| Cervical flexion: | 2.0 | Lumbar flexion: | 3.2 |

6.    An adult with the muscle strength stated in Love's report  would be unable to sit up, stand, walk, demonstrate any trunk range of motion, or lift her head off a pillow while lying down.  Stuart was able to walk, sit, and bend over.  Any chiropractor reading Love's report and observing Stuart would suspect fraud.

7.    Plaintiff had his female office assistant witness the examination and audio recorded Stuart's interview and examination responses.  Dr. Pearce dictated a report during his examination.  Plaintiff performed a standard neurological, orthopedic and chiropractic examination of Stuart.  The examination included a digital rectal examination.  This examination was necessary to determine whether Stuart's claimed constipation, urinary difficulties and numerous back and leg complaints were caused by her industrial injury.  The law required Dr. Pearce to base his opinions on current timely and clinically relevant examinations.  The rectal examination was required to diagnose whether her

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

claimed back injury or her chiropractic treatment had any causal relationship to her claimed constipation and urinary difficulties. Thus, Dr. Pearce had to perform the rectal examination to perform his duty to truthfully report his findings and opinions as a person certified to make industrial injury examinations.

8.    Dr. Pearce observed several findings that indicated malingering, hysteria, and fictitious illness. For example, Stuart refused to squat more than half way toward a sitting posture claiming she would fall down, yet sat and got up from sitting without difficulty. During orthopedic testing, she was positive for tests for which, if she was truly positive for those tests, she would have been scarcely able to walk, yet she moved about Dr. Perce's office with no difficulty or sign of distress. She claimed she could not bend over past a few degrees, yet, when she thought Dr. Pearce was not looking, she bent over in a fluid motion and picked up a piece of clothing from the floor. Dr. Pearce found that she had no physiological evidence of pain when she was claiming great pain.

9.    The day after he examined Stuart, August 7, 1991, Dr. Pearce reviewed Stuart's medical records. Dr. Pearce consulted an urologist about Stuart's previous urologic studies and Pearce's examination findings and planned to consult a neurologist about these same findings before completing his report. Before consulting a neurologist, Pearce spoke by telephone with Sovy Medved ("Medved"), the adjuster for SCIF. Medved had requested the examination of Stuart. Dr. Pearce reported to Medved that he did not think that Stuart's symptoms were caused by an industrial injury, but likely were psychosomatic complaints (i.e., physical complaints caused by a neurosis). For that reason, Dr. Pearce stated that he did not think that Stuart's complaints could be treated by chiropractic treatment.

10.    In the August 7, 1991 phone call with Medved, Dr. Pearce also reported to Medved that he suspected that Stuart and Love were engaging in an

**5**

---

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

insurance fraud.   Unknown to Dr. Pearce, the State Board of Chiropractic Examiners ("Chiropractic Board") had charged Love with five counts of incompetence and insurance fraud.

11.   On or before August 19, 1991, Medved communicated to Love and Stuart that SCIF intended to dispute that there was an injury based on the findings of Dr. Pearce that Stuart and Love were engaging in an insurance fraud.

12.   On or about August 1991, Stuart and Love agreed that Stuart would claim that Dr. Pearce had committed a sexual battery on her when Dr. Pearce had performed the rectal examination.  They did this to discredit the report of Dr. Pearce.  They agreed that Stuart would report to the Chiropractic Board that Dr. Pearce had committed a sexual battery on Stuart.  The purpose of Stuart was to support her claim for worker's compensation case.  The purpose of Love was to defend himself against another charge by the Chiropractic Board of fraud and incompetence.

13.   Susan Levin ("Levin") was the attorney for Stuart's workers' compensation claim.  On or about August 1991, Levin became aware that Dr. Pearce suspected that Stuart  and Love were engaged in an insurance fraud.  On or about August 1991, Stuart and Levin agreed that Levin would support Stuart's claim that Dr. Pearce had committed a sexual battery on Stuart.  To carry out this agreement, Levin advised Stuart to report to SCIF and to the Chiropractic Board that Dr. Pearce had committed a sexual battery on her.  The purpose of Stuart and Levin was to recover money on Stuart's worker's compensation claim that would otherwise have been lost.

14.   Levin or Love referred Stuart to Denine Guy ("Guy") of the Law Firm of Yonts & Fulton.  Levin did this to gain additional support for Stuart's claim that plaintiff had sexually battered Stuart.  Guy and her law firm agreed with Levin, Love and Stuart to file a lawsuit against Dr. Pearce for sexual battery.   The

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

purpose of these lawyers was to recover damages against Dr. Pearce.  The purpose of Levin and Stuart was to recover a worker's compensation claim and to discredit Dr. Pearce's diagnosis of Stuart.  The purpose of Stuart was to discredit Dr. Pearce and to recover damages from him.

15.    In August 1991, to carry out the agreements Stuart made with Love, Levin, Guy, Fulton, Yonts, Yonts & Fulton, Stuart and Love wrote a two page statement in which Stuart falsely claimed that she had been vaginally and rectally penetrated with a stick multiple times by Dr. Pearce and had suffered injury and pain as a result.

16.    Levin, Guy, Fulton, Yonts, and Yonts & Fulton and Love agreed that Stuart should report her claim that Dr. Pearce had sexually battered her by reporting that she had been sexually battered to the San Jose Police Department. On September 5, 1991, Guy made the report through the offices of the Yonts & Fulton Law Firm.  Guy, Fulton, and Yonts assisted Stuart and Love by having Guy make the report for Stuart and by reporting that Love was a witness willing to testify for the Stuart.  The purpose of making a report to the police was to corroborate Stuart's story that she had been the victim of a sexual battery.  The San Jose Police Department conducted an investigation which resulted in the case being closed without prosecution.

17.    Levin, Guy, Fulton, and Yonts, and the Yonts & Fulton Law Firm advised Stuart to make a report of sexual battery to the Chiropractic Board. These lawyers wanted to deprive Pearce of the ability to defend against the lawsuit they had decided the Yonts & Fulton Law Firm would file against Dr. Pearce by making the complaint to the Chiropractic Board.  On or before October 4, 1991, Guy prepared a complaint for Stuart to file with to the Chiropractic Board.  The report stated that Dr. Pearce had committed a sexual battery on her. James Sharp ("Sharp") was an investigator for the Chiropractic Board.  The

**7**

---

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

Chiropractic Board assigned Sharp to investigate Stuart's claim.    Sharp interviewed Stuart at the offices of Yonts & Fulton.  Guy was present and advised Stuart during the interview.

18.    As agreed among Levin, Guy, Fulton, Yonts, and Yonts & Fulton, these attorneys commenced a lawsuit against Pearce on October 4, 1991 by writing him a notice of intent to sue pursuant to California Code of Civil Procedure section 364.  On January 23, 1992, Denine Guy filed for the Yonts & Fulton Law Firm, *Machado v. Pearce* in Santa Clara County Superior Court against Pearce. The complaint claimed Pearce had sexually battered Machado with a stick by penetrating her vagina and rectum multiple times in front of his female office assistant.

19.    The California State Board of Chiropractic Examiners ("Chiropractic Board") consists of members appointed to four year terms.  Beginning in 1992, members consisted of R.  Lloyd Freisen, D.C., appointed 1990; Michael Martello, D.C., appointed in 1990; Lloyd E.  Boland, D.C. appointed in 1992; Deborah Marie Pate, D.C. appointed in 1992; John Bovee, appointed in 1993; Rosa Marie Lee, appointed in 1993; Sharon Ufberg, D.C, appointed in 1994; Jeffrey Steinhardt, D.C., appointed in 1994; stephen Feman, D.C., appointed in 1995; Lloyd E.  Boland, D.C, appointed in 1996; Jacalyn Buettner, D.C., appointed in 1996; Craif Missakian, J.D., appointed in 1997; and John DeRonde, Jr., J.D., appointed in 1997.  Drs.  Ufberg and Steinhardt were re-appointed in 1998. When referred to collectively, these parties are "Board Members."

20.    The Chiropractic Board Members, Deputy Attorney General Romeo ("Romeo"), Board Executive Director Vivian Davis ("Davis"), and its investigator, James Sharp ("Sharp"), (collectively "Board Officers") agreed that plaintiff should be prosecuted for having performed a rectal examination on Stuart and for having made a diagnosis of her psychosomatic condition.  They agreed even though

**8**

---

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

they knew that Dr. Pearce's diagnosis of Stuart's psychosomatic condition was valid and knew that this diagnosis and performance of the rectal examination was necessary to properly diagnose the symptoms and complaints Stuart presented. They agreed to prosecute plaintiff because of the political view held by the Chiropractic Board and the Attorney General.

21.    The Chiropractic Board members held that chiropractors should not perform rectal examinations or make psychological diagnoses.  This political view was against the law.  The law was that it was within the scope of practice for a chiropractor to perform a rectal examination and to make psychological diagnoses.   In 1923 the California State Board of Chiropractic Examiners ("Chiropractic Board") was formed pursuant to the 1923 Chiropractic Initiative Act. In 1948, the people of the State of California voted to pass the 1948 Initiative Act. The 1948 Act Initiative Act mandated that chiropractors learn psychiatry to be able to make psychological diagnoses as part of their care of patients.  One purpose of the 1948 law was that chiropractors should have a duty to assess psychosomatic complaints so that patients would not be subjected to unnecessary physical  treatment.  In 1978, the Legislature, in implementing the 1978 Initiative Act defined a chiropractor as  "one who practices the healing arts without the use of drugs or surgery."

22.    Despite the law, the Chiropractic Board members held that the scope of chiropractic should not include rectal examinations or psychological diagnoses. This view manifested in 1981, when the Chiropractic Board changed the educational regulations for the education of chiropractors. The regulations dispensed with requiring student chiropractors to perform rectal examinations on live persons.  As a result of the watered down educational requirements, many chiropractors who became licensed after 1981 did not have sufficient training to be able to safely perform and interpret the results of rectal examinations.  Rather

**9**

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

than remedy this educational deficiency, the Chiropractic Board and its members embarked on a campaign to impose its political view that chiropractors should not perform rectal examinations and make psychological diagnoses. The Chiropractic Board carried out this campaign by prosecuting disciplinary charges against chiropractors who did rectal examinations or internal coccygeal adjustments (which necessitate a digital rectal insertion). Joel Primes, the Chiropractic Board counsel appointed by the AG, carried out a campaign to impose this political view of the Chiropractic Board in presentations at re-licensing seminars. During these seminars, Primes boasted about how many chiropractors he had prosecuted for doing internal coccygeal adjustments.

23. The California's Attorney General's Office ("AG") also held the political view that chiropractors should not perform rectal examinations or make psychological diagnoses. In 1989, the AG brought lawsuits on behalf of the California Medical Board and the California Physical Therapists to restrict the scope of the practice of chiropractic to not include physical therapy procedures and certain gynecological procedures. Although these cases were unsuccessful, the AG and Chiropractic Board Members continued to hold the view that the scope of the practice of chiropractic should not include rectal examinations or diagnoses of mental diseases or disorders even though the board had previously stated in open letters to the public that chiropractors are required to examine and diagnose without limitation as to the examinations performed and diagnoses arrived at. California Business and Professions Code section 2038 defines diagnosis as "any undertaking by any method, device, or procedure whatsoever, and whether gratuitous or not, to ascertain or establish whether a person is suffering from any physical or mental disorder."

24. When Stuart made her complaint to the Chiropractic Board on October 4, 1991 and in later interviews with Sharp, the Chiropractic Board, the

**10**

---

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

Chiropractic Officers, and the AG seized the opportunity that Stuart's complaint presented to impose their view of what was the proper scope of chiropractic practice.

25. The Chiropractic Board, the Chiropractic Board Members, and the AG agreed to prosecute Stuart's complaint, not for the legitimate purpose of enforcing their duties, but to promulgate their view that it was improper for chiropractors to perform rectal examinations or make psychological diagnoses.  Because their purpose was to proselytize their political view, they refused to consider the evidence that Dr. Pearce was innocent of having committed a sexual battery on Stuart.

26.  The Chiropractic Board, the Chiropractic Members, and the AG refused to consider the overwhelming evidence that Love and Stuart had been engaged in an insurance fraud and that they had made the complaint of sexual battery to divert attention from their fraud.  Any chiropractor who read Love's strength test report had to suspect that it was a fraud.  The Chiropractic Board Members were chiropractors.  Likewise, attorneys experienced in workers compensation, medical fraud or disciplining doctors, would know that Love's strength test report was evidence of fraud.

27. The Chiropractic Board had pending five counts of insurance fraud and malpractice against Love.  Rather than consider whether Love and Stuart had made a complaint to divert attention from their insurance fraud, the Chiropractic Board dismissed its five counts of insurance fraud and malpractice against Love.  Love then testified against Dr. Pearce as a witness for Stuart in the lawsuit Stuart first brought against Pearce.

28. The overwhelming evidence that Dr. Pearce had not committed a sexual battery included evidence of Stuart's physicians.  At her instance, Vincent Frank Nola, M.D., her gynecologist, and Alfred Hurwitz M.D., her

**11**

---

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

gastroenterologist, examined Machado for evidence that she had been sexually battered by Dr. Pearce. Stuart claimed that Dr. Pearce had penetrated her rectum and vagina several times with a stick and this caused her injury. Stuart asked Dr. Nola and Dr. Hurwitz to examine her to support her claim. The physicians found no evidence to support her claim.

29. Because the Chiropractic Board Members were determined to impose their political view, the Board members agreed, through Davis and Sharp, to hire defendant C. Brett Sullivan ("Sullivan"), a chiropractor, to write a report claiming that plaintiff's diagnosis of Stuart and his rectal examination of her had been improper. They chose Sullivan because they knew Sullivan believed that the scope of chiropractic care precluded rectal examinations or psychological diagnoses. Sullivan advocated this view because he had not been trained to do either procedure on live human beings, did not do either procedure, was not competent to do either, and was not competent to express an opinion on how the procedures should be performed.

30. The procedure of the Chiropractic Board called for a chiropractor to write a report on which the Chiropractic Board decided whether to charge. On or about March 29, 1992, Sullivan wrote a report on which the charge against Dr. Pearce was based. In his charging report, Sullivan claimed the diagnosis and rectal examination of Stuart were beyond the standard of practice of chiropractic care. Sullivan stated in his report that a rectal examination and psychological assessment were improper under any circumstances. These statements revealed that Sullivan had based his opinion on a view that was against the law and he was, therefore, incompetent to testify on the standard of care. Sullivan submitted the charging report to the Chiropractic Board. The Chiropractic Board members, acting through its staff, read the report and knew that it revealed that Sullivan was incompetent to state an opinion on the standard of care. The

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

Chiropractic Board Members, either directly or through its staff, instructed Sullivan to delete the statements that revealed that he was incompetent. Thereafter, Sullivan submitted another report that expurgated the statements that revealed his incompetence. This report was back-dated to make it appear that it had been the original charging report.

31.    To cover up the fabrication of the charging report, the Chiropractic Board Officers agreed to prevent Dr. Pearce from obtaining a copy of Sullivan's original, unexpurgated report. The Chiropractic Board officers concealed from Dr. Pearce that Sullivan and the Chiropractic Board had fabricated the charging report to make it appear that Sullivan was competent to state an opinion on Dr. Pearce's examination of Stuart. Dr. Pearce was not able to obtain a copy of the unexpurgated report until four years later, after the Chiropractic Board had revoked his license based on the fabricated report. It was only after his license had been revoked that Dr. Pearce discovered the existence of the original report. At some point during this time, M. Elizabeth Ware became Executive Director of the Chiropractic Board. At that point, she became a member of "Board Officers" identified herein.

32.    On August 13, 1993, the Santa Clara Superior court entered judgment *nunc pro tunc* in favor of Dr. Pearce in *Machado v. Pearce* and awarded Pearce $18,696.08 in costs. Guy, Levin, Fulton, Yonts, and Yonts & Fulton decided to use the Chiropractic Board to defend them from liability for what they had done to Dr. Pearce. They believed that if the Chiropractic Board found that Dr. Pearce had committed a sexual battery on their client, this would establish that there had been probable cause to have filed and prosecuted the lawsuit for damages against Dr. Pearce. To carry out this scheme, the attorneys solicited the aid of Richard Alexander ("Alexander").

33.    Alexander had law offices in San Jose, California. Alexander had a

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

reputation for representing women who claimed to be sexually abused.  After consulting with Guy, Levin, and Fulton, Alexander agreed that he would seek to recover damages form Dr. Pearce by publicizing in the newspapers that Dr. Pearce had committed a sexual battery on Stuart and by filing a lawsuit against Pearce alleging the same claims.  Based on his experience in suing others, Alexander calculated  that this publicity would attract other women to claim that Dr. Pearce had sexually abused them.  Alexander and Stuart's attorneys, Guy, Levin, Fulton, Yonts, and Yonts & Fulton agreed that Alexander would claim that Dr. Pearce had committed a sexual battery on Stuart despite the jury having found in Stuart's lawsuit against Dr. Pearce that he had not committed a sexual battery on her.  They agreed that Alexander would claim that Dr. Pearce had intimidated Medved, the worker's compensation insurance adjustor, into not revealing a "confession" to Medved that Pearce had sexually battered Stuart. The also agreed that Alexander would state these claims in writing the Chiropractic Board.  None of these attorneys ever asked Medved if Pearce had made such a confession.   Pearce never made such a confession and Medved has written affidavits stating Pearce never made any such confession.

34.   In furtherance of the agreement, on or about November 9, 1994, Alexander mailed a letter to Romeo, the Deputy AG representing the Chiropractic Board.  In this letter, Alexander claimed that Dr. Pearce had confessed to Medved that he had sexually battered Stuart and intimidated Medved to lie for him in Stuart's lawsuit, *Machado v. Pearce,* against Dr. Pearce.  In the letter, Alexander also claimed that Pearce's wife had charged Pearce with attempted murder, that Pearce liked rough sex, and was a mean person.  The purpose of the letter was to cause Romeo to pursue the charge against Dr. Pearce despite the evidence that had come out in Stuart's trial against Dr. Pearce that Dr. Pearce had not done what Stuart claimed.

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

35.  Alexander and Sharp agreed to solicit reporter Scott Winokur to plant an article in the San Francisco Examiner that Pearce was a sexual predator who had sexually battered Stuart and then covered up his crime by intimidating Medved.  On June 5, and June 12, 1995, Alexander utilized the U.S. mails to send letters and drafts of his complaint for Stuart against Pearce, Medved, and State Compensation Insurance Fund to Scott Winokur.  In the complaint and letters, Alexander alleged Pearce, Medved, and State Compensation Insurance Fund had an ongoing conspiracy to defraud workers of their compensation benefits, that State Compensation Insurance Fund knew Pearce was a sexual predator and had a deal with him where, in exchange for his defrauding workers' compensation claimants on their behalf, they would cover up his sexually battering the claimants.  In his letters to Winokur, Alexander stated he had "retained" one of Dr.  Pearce's expert witnesses in the upcoming Chiropractic Board hearings on his license to change his testimony from what he had testified to in *Machado v.  Pearce*.

36.   On June 15, 1995, the article was published on the first page of  the San Francisco Examiner under the title, "Suit Says Insurer Helped Doctor to Hide Sex Attack".  The article featured a picture of Stuart and Levin together and reported all of Alexander's claims. This newspaper had a circulation of about one-half million.  Alexander and Sharp agreed that Alexander should refer any inquiries concerning the claims in the article to Sharp.  The article had statements attributed to Stuart, Levin, and Romeo.

37.   The article reported all Alexander's quotations from the report of Dr. Sidle.  In the article, Stuart was attributed as having said, "That man (Pearce) took my dignity - everything from me - I can't stand telling anyone how dirty it was;"  "Can you ever fix me? No. I'll have to live with it the rest of my life."  Stuart knew these statements were false and knew her doctors, after examining her,

**15**

---

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

could not support her claims. This was known to Stuart, Romeo, Levin, Love, Guy, Fulton, Yonts, Yonts & Fulton, Jon Stuart, and Alexander.

38.    In the article in the Examiner, it was attributed to Romeo that what Dr. Pearce had done was against the law and appeared to be a sexual battery.  At the time, Romeo knew that it was lawful for Dr. Pearce to have done a rectal examination on Stuart and it was appropriate to assist in determining whether Stuart's complaints were caused by an industrial accident.  Romeo also knew that Dr. Pearce had conducted the rectal examination to determine whether Stuart's complaints could have been caused by an industrial accident.  By intentionally omitting to state that it was lawful and appropriate for Dr. Pearce to have conducted a rectal examination of Stuart to diagnose whether the complaints of Stuart were caused by an industrial accident, Romeo gave the false impression that it was unlawful sexual battery under any circumstances for Dr. Pearce to have done a rectal examination on Stuart.  She thereby publicized and reinforced the political view held by the Chiropractic Board that chiropractors should not have perform rectal examinations under any circumstances.

39.    The Examiner article had statements attributed to Levin.  Levin appeared in a picture beside Stuart.  Levin said that she had never seen such a case as the one against Dr. Pearce.  At the time Levin made this statement, she knew that Stuart  and Love had made a report that indicated that they were perpetrating an insurance fraud.  Levin also knew that Stuart's physicians contradicted what Stuart claimed.  Stuart's gynecologist later testified at the Chiropractic Board hearing, on April 30, 1996, that Dr. Pearce could not have done what Stuart claimed.  Levin also knew that as the attorney for Stuart's worker's compensation case, she was prosecuting a fraudulent claim.  Despite this knowledge, Levin stated what she knew was false to discredit the report of Dr. Pearce and to cover up that she had helped Stuart commit workers'

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

compensation fraud.

40.   On July 5, 1995, another article was printed in the San Jose Mercury News under the heading, "Doctor, 2 Others Sued in Sex Case".  This article restated Alexander's claims.

41.   Starting when Dr. Pearce received service of the Chiropractic Board's accusation against him on or about the middle of August 1993, and continuing through August 1995, Pearce implored Romeo and Davis to receive the evidence that had been adduced in *Machado v. Pearce*.  Until August 21, 1995, Romeo rebuffed Pearce's entreaties.  On August 21, 1995, Romeo presented to Pearce's attorney to review the evidence in *Machado v. Pearce*. On that day, Romeo also informed Pearce's attorney that she would to be calling Sovy Medved as a witness to testify against Pearce.  She admitted to Dr. Pearce's attorney that Medved was not reliable as a witness for such a purpose.

42.   On August 31, 1995, Romeo wrote a letter to Administrative Law Judge Lew, the Presiding Judge, claiming that Dr. Pearce had been stalking witnesses.  Romeo did not inform Dr. Pearce that she had sent a letter and Dr. Pearce did not know that Romeo had sent a letter to the administrative law judge**.** Romeo's claims to Lew were false.  Romeo asked for an order that a peace officer be allowed to search Dr. Pearce before each session of hearing.  Lydia Zane assisted Romeo in this endeavor.  Judge Lew refused to order Dr. Pearce searched.  Instead, Judge  Lew ordered that a peace officer could be present.

43.   On September 7, 1995, the Chiropractic Board began the hearing to revoke Dr. Pearce's license.  On the first day of hearing, Romeo stated to the Administrative Law Judge who was hearing the charge, that Romeo had authority from Judge Lew, the Presiding Law Judge, to have plaintiff searched.  Based on her fabrication that Judge Lew had authorized the searches, Romeo had Dr.

---

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

Pearce searched by Sharp with the assistance of the peace officer (identified in caption and herein as "Unknown Peace Officer") upon entering the hearing room for the first two weeks of trial.  These illegal searches occurred in front of Administrative Law Judge Ruth Astle.  It appeared to  Judge Astle that Judge Lew must have ordered the searches for a reason.  Dr. Pearce was the only person who Romeo ordered searched.  The implication of these searches was that Dr. Pearce posed a threat to the witnesses and courtroom personnel.  This implication supported the theory advanced by the prosecution that Dr. Pearce had treated Stuart and the other women who testified violently.  By ordering these searches in front of the Administrative Law Judge, Romeo fabricated evidence that plaintiff had intimidated Stuart and was a danger to everyone in the hearing room.

44.    On September 7 - 9, 1995, the first three days of the hearing,  these searches consisted of pat searches of plaintiff by Sharp.  Sharp made a point of holding the testicles of Dr. Pearce while doing these searches.  Sharp grinned up at Pearce as he did this.  It appeared to Pearce that Sharp did this to show his contempt for what Dr. Pearce had allegedly done to women victims.  Dr. Pearce was humiliated.  His attorney protested that these searches were prejudicial.  In response, the pat down searches were replaced with searches by a hand held metal detector.  Not until the end of the first two weeks of trial did the searches stop.  After that time, Astle ordered that the police officers be present to guard Pearce throughout the trial.   By conducting these searches to show their contempt for Dr. Pearce, Romeo and Sharp implied by their conduct that they knew Dr. Pearce deserved to lose his license and that ALJ Astle should be concerned that if he was not found guilty of something for which his license could be revoked, he would be a danger to the public, and regardless of whether his license was revoked, he was a danger to ALJ Astle.  Astle ordered that Pearce

**18**

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

be guarded during the trial, Astle indicating that Romeo's plan to prejudice Astle had succeeded.

45. The newspaper publicity attracted persons to come forward with complaints against Dr. Pearce. One the persons who came forward was Lynde Scheffer. In 1991 Scheffer came to Dr. Pearce for an examination to support her workers' compensation claim. Dr. Pearce diagnosed her claim as a Thoracic Outlet Syndrome, a diagnosis not covered by worker's compensation because the origin of such a disorder could not be causally related to her job duties. Scheffer did not disclose what Dr. Pearce had diagnosed to the worker's compensation carrier. By concealing Dr. Pearce's diagnosis, she received a compensation award from a workers' compensation carrier.

46. After reading the newspaper articles planted by Alexander, Scheffer reported to the Chiropractic Board that Dr. Pearce, while conducting an examination, had sexually molested Julie Snider, a female chiropractor, when Snider was a student at Palmer College of Chiropractic. This statement was false. In fact, Dr. Pearce had never met Julie Snider as a student and had never examined her. In the fall of 1995, Scheffer was interviewed by Sharp. By then it had come to light that Dr. Pearce had never examined Snider. Sharp advised Scheffer to change her story. Scheffer then claimed that in 1989 Dr. Pearce had conducted a breast examination on her that had not been indicated. This claim was false and Scheffer knew it.

47. Patricia Brickman ("Brickman") was another person who the newspaper publicity had attracted to make a complaint. On or about July 1995, she contacted Alexander, who referred her to Sharp. She was interviewed by Sharp. She claimed that plaintiff had conducted a breast examination and placed a finger in her anus suddenly for no apparent reason. In fact, in 1984 Brickman had seen Dr. Pearce about an injury to her tailbone and other complaints. She

**19**

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

had x-rays taken.  She did not pay the bill for the x-rays and Dr. Pearce sent the bill to collection.  In retaliation, she complained to the Chiropractic Board that Dr. Pearce had sexually assaulted her.   The Chiropractic Board rejected her complaint.  However, after Sharp interviewed her, the Chiropractic Board decided to use her complaint to support its view that tailbone adjustments through the anus were improper.

48.    Lezlie Morrow ("Morrow") was another person Alexander attracted by the newspaper publicity.  On or about the summer or 1995, Morrow contacted Alexander, who referred her to Sharp.  Morrow had been gang raped twice and resented men.  After Sharp interviewed Morrow, she claimed that in 1987 that she had been taught to do a breast examination by Dr. Pearce and that she had never had a breast examination before that time.

49.    Neither Sharp nor any other defendant investigated to verify the truth of Scheffer's, Brickman's, or Morrow's claims.  Instead, Sharp prepared a report in which he omitted the fact that Scheffer had changed her story.  In November 1995, he mailed his report to the Chiropractic Board and Carol Romeo.  The Chiropractic Board utilized Sharp's report as the charging report in a second accusation against Pearce.  The Chiropractic Board served Sharp's report by mail as a supplemental accusation against Pearce on December 19, 1995.

50.    In December 1995, a demurrer was sustained against Alexander's lawsuit against Pearce.  In February 1996, Alexander persuaded Thomas Hogan, Dr. Pearce's attorney in that matter, to waive costs and file a dismissal of the action memorializing Alexander's agreement with Hogan.  Hogan's agreement violated his contract to defend Dr. Pearce in that action.   The effect of the dismissal was to preclude Dr. Pearce from prosecuting a case for malicious prosecution against Alexander.  Dr. Pearce was unaware of Alexander's deal with Hogan.

**20**

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

51.    In April 1996, Romeo called Dr. Pearce's attorney and claimed that Scheffer had been threatened with murder at the request of Dr. Pearce.  This claim was false.

52.    The hearing on Scheffer's, Brickman's and Morrow's claims against Pearce began on April 29, 1996.  In the hearing, Romeo again claimed that Pearce had threatened to murder Scheffer.  Romeo dropped that claim only after Pearce's attorney, Louis Castro, offered to prove Romeo was not telling the truth.

53.    Brickman testified at the hearing that that the finger Dr. Pearce had placed in her anus was done when Dr. Pearce had done an adjustment and the adjustment had been successful in treating her.  This information had been available to Sharp, but he had not included it in the supplemental charging report.

54.    Scheffer testified at the hearing that she did not know if Dr. Pearce had performed a breast examination on her because she could not remember him performing a breast examination on her.  In fact, Dr. Pearce had never performed a breast examination on her.

55.    Morrow testified that after consulting her diary and the dates in which she was in other trials, that she could not have been taught a breast examination by Dr. Pearce, or anyone else, before 1987.  She further testified that her history and examination lasted less than fifteen minutes.  Dr. Pearce had, in fact examined Morrow's jaw, neck, back, lungs, and knee in 1983 in an examination, with x-rays, that lasted more than an hour.

56.    At the hearing, Dr. Pearce subpoenaed the board's investigator's file by serving the subpoena on Sharp.  Both Sharp and the Chiropractic Board Officers refused to honor the subpoena and refused to turn over Sharp's file.  (By this time, Board Officers included M.  Elizabeth Ware as Executive Director, Vivian Davis having left the position.)

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

57.    In November 1996, the Chiropractic Board issued its decision revoking Dr. Pearce's chiropractic license.  In the decision, Chiropractic Board exonerated Plaintiff of sexual misconduct, but found him guilty of having practiced outside of the standard of care by making his diagnosis of Stuart's  physical and mental condition and for having performed a rectal examination of her.  The Chiropractic Board also based its decision to revoke Plaintiff's chiropractic license on the grounds that Plaintiff had not obtained proper consent for his examinations and had an attitude that they did not like.  California Business and Professions Code section 475(c) did not allow the denial, suspension, or revocation of a health care providers' license on the ground of his having an attitude.

58.    Dr. Pearce filed a petition for writ of administrative mandate on the grounds that the revocation was improper because he had obeyed the law in everything he had done and the chiropractic board had violated his rights to due process because it had not given him notice that his attitude or whether consent was properly obtained were issues he had to defend against.  In late February or early March of 1997, Dr. Pearce obtained Sullivan's original report and the letters Alexander had written to Scott Winokur of the San Francisco Examiner.  In July 1997, a hearing was held in Santa Clara Superior Court on Dr. Pearce's petition to review the board's decision.  The court ordered the revocation of Dr. Pearce's license be set aside.  The court remanded the matter back to Chiropractic Board for hearing evidence on why Sullivan's original charging report had been suppressed, why the Board did not allow full cross-examination of Morrow and why Alexander and Sharp had conspired together to plant the San Francisco Examiner newspaper article.  The court also ordered the Chiropractic Board to reconsider its decision in light of the due process violations Dr. Pearce had stated in his petition.

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

59.    From March 2, through March 13, 1998, the Chiropractic Board held the remand hearing that had been ordered by the Superior Court.  Morrow was called to testify.  Morrow testified that she had been approached by personnel from the AG's office who told her to change her testimony.  (This person is identified in the caption and herein as defendant "Unknown AG Agent.")  As the AG had requested, she changed her testimony to support the AG's claim that Dr. Pearce had performed a breast examination on her and fondled her breasts in 1983.  This testimony was false**.**

60.    On March 3, 1998, Sullivan testified he had given the original unexpurgated report of March 29, 1993 directly to Sharp and had been instructed to change his report by a staff person at the Chiropractic Board.   The identity of this staff person is not known to plaintiff, and therefore, plaintiff identifies this person in this complaint as Unknown Chiropractic Board Officer.

61.    On March 4, 1998, Sharp testified that he had never seen the original, unexpurgated Sullivan report.  The board's investigative file was again subpoenaed by subpoenaing Sharp.  Sharp evaded the subpoena, and when his evasion eventually failed, reported through his testimony and Robert Bourke's, his superior's, testimony that he had destroyed his file between receiving the first and second subpoenas**.**

62.    On March 6, 1998, Alexander testified at the Chiropractic Board hearing.  In his testimony, Alexander admitted he had filed his lawsuit against Dr. Pearce without probable cause and without having researched the law to determine if the suit was legally tenable.

63.    Nevertheless, Alexander testified that Dr. Pearce sued him for defamation and malicious prosecution, without probable cause, to defraud the chiropractic board by pressuring Alexander into giving false testimony.  At the time Alexander gave this testimony, he knew this testimony was false. The truth

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

is that Alexander had defamed and maliciously prosecuted Dr. Pearce and he knew it. Alexander further testified that Dr. Pearce had intimidated Medved into producing affidavits which stated Alexander's claims to Winokur and in his lawsuit against Dr. Pearce were false. On April 20, 2001, Alexander admitted under oath that neither he nor anyone on his behalf had attempted to contact Medved to determine if Alexander's testimony before the Chiropractic Board was accurate. In fact, Alexander's testimony concerning Medved before the Chiropractic Board was false, and Alexander knew when he made the testimony that he had no factual basis for this testimony. In May 2001, Alexander authorized his attorney, Ed Cullen, to state that the publication of his claims to Winokur was a "significant injustice to Dr. Pearce".

64.    In addition to testifying falsely at the March 1998 hearing, Alexander stated to Romeo that Romeo and Alexander had "got" Dr. Pearce on Medved's claims as Alexander had first falsely published them and coached Romeo in how to question him. Romeo then followed his advice in questioning him. Alexander committed his perjury before the Chiropractic Board and coached Romeo in how to elicit his perjury for two reasons. First, he wanted to fulfill the agreement he had made with Guy, Levin, Fulton, Yonts, and Yonts & Fulton to have Dr. Pearce successfully prosecuted by the Chiropractic Board. Second, he wanted to deter Dr. Pearce from prosecuting his lawsuits against Alexander for defamation and malicious prosecution.

65.    On March 5, 1998, Romeo again claimed in writing to PLJ Lew that plaintiff intimidated a witness during the hearing. Romeo knew when she made her request that she was not telling the truth in her request. Lydia Zane assisted Romeo in preparing this request. In response to Romeo's request, PLJ Lew ordered that a peace officer be present when plaintiff was in the hearing room.

66.    On September 2, 1998, Chiropractic Board Members again revoked

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

Dr. Pearce's chiropractic license on the same grounds they had previously revoked it.

67.    In January 1999, Dr. Pearce filed a petition for a writ of mandate from the Santa Clara County Superior Court to review the Chiropractic Board's revocation of his license.  The petition pleaded that the Board failed to properly determine the credibility of witnesses, that Dr. Pearce had been denied due process by the board finding him guilty of things, such as not obtaining consent and having a bad attitude, not charged; that Dr. Pearce had obeyed the law and practiced within the standard of care when examining and diagnosing Stuart; that the Chiropractic Board had raised the penalty in violation of due process; and the Chiropractic Board had punished him for dating a patient's relative even though there is no law or regulation to the support such a punishment and making such a punishment is in violation of the Federal Constitution's First Amendment guarantee of the right to free association.  In March 1999, the Superior Court denied the writ, stating in essence that the credibility determinations by the Board were binding and the  due process and constitutional arguments were insignificant.  On June 25, 1999, plaintiff appealed the denial of the writ to the California Court of Appeal.

68.    While Dr.  Pearce's appeal was pending, his lawsuits against Alexander were also pending.  During the course of those lawsuits, Alexander had, on April 01, 1999, suborned the lawyer who defended plaintiff in *Stuart v. SCIF,* Thomas Hogan, to testify by affidavit that plaintiff had authorized a settlement of that lawsuit**.**  Alexander wanted to set up a defense to  *Pearce v. Alexander* by claiming *Stuart v. SCIF* had been settled with Dr.  Pearce's consent.

69.    Alexander was in regular communication and working in concert with Romeo, by among other things, sending copies of all depositions he obtained

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

while defending plaintiff's lawsuits to Romeo's office.

70.    On August 18, 1999, during a hearing on his lawsuits, plaintiff explained to a judge that Alexander's lawyers were presenting, under oath, two mutually exclusive claims about money they had spent defending against Dr. Pearce, of which, only one could be true.  Upon leaving the courtroom, Anthony Pinelli, Alexander's lawyer, threatened plaintiff with physical violence if plaintiff attempted to make such an explanation again.  The threat shook up plaintiff. After consulting court personnel and lawyers, Plaintiff wrote Pinelli asking for an apology.  On August 19, 1999, Pinelli's partner, Jack Williams, wrote plaintiff back admitting the assault had occurred and stating, in essence, that plaintiff deserved to be shot by him or Pinelli.  On or about September 2, 1999, Winifred Botha, another attorney for Alexander, telephoned plaintiff and again threatened physical violence against plaintiff.

71.    Alexander devised a scheme to sabotage plaintiff's appeal by making it appear that Dr. Pearce had protested the assault and threats because he was delusional, paranoid, and narcissistic and was therefore a threat to the courts and parties.    In order to carry out this scheme, Alexander and Botha misrepresented to two psychologists they had hired to examine Dr. Pearce into believing Dr. Pearce had committed all of the acts the Chiropractic Board claimed.  They agreed to hire these two psychologists, Louis Everstine and Diana Everstine, because Alexander had used them before and knew he could rely upon them to say whatever he wanted them to say about Dr. Pearce.  The Everstines agreed to fabricate a report that claimed Dr. Pearce was delusional, paranoid, and narcissistic and, hence, a danger to Alexander, the Chiropractic Board, the Court, and to every witness who had testified against him.  They further agreed to destroy evidence in their interview of Dr. Pearce which contradicted their report and to falsify testing so as to support their diagnosis.

**26**

---

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

Botha agreed to participate in this course of action because she wanted to cover up her having threatened Dr. Pearce.

72.    On October 12, 1999, Botha and Alexander obtained a temporary restraining order based on the Everstines' fabricated report.  Alexander asked the court to authorize him to inform Chiropractic Board and the California Acupuncture Board ("Acupuncture Board"), the courts, the  Chiropractic Board and all defendants herein, of the TRO.  The court denied Alexander's request and ordered him not to inform anyone other than parties to Dr. Pearce's lawsuits against Alexander of the existence of the TRO or any information upon which the TRO was based.

73.    Alexander violated the court's order by sending copies of the TRO to Romeo who in turn provided copies to the Chiropractic Board and Acupuncture Board.  Alexander also violated the trial court's order by informing the Appeals court of the TRO while plaintiff's appeal and his lawsuit for malicious prosecution against Alexander was pending before that court.  Alexander intended, by informing the Appeals court of the TRO, to prejudice said court in plaintiff's appeal of the revocation of his license and his appeal in his lawsuit against Alexander.

74.    In support of his TRO attempt, on November 15, 1999, Alexander suborned attorney for Stuart, Thomas Lewellyn ("Lewellyn"), to falsely state under oath that Dr. Pearce had stalked him.  Lewellyn was an attorney who defended Alexander in Dr. Pearce's suit againt her.  Dr. Pearce had gone to the office of Lewellyn at the invitation of Lewellyn to deliver and discuss some papers.  Lewellyn testified that Dr. Pearce had gone to his office unannounced to stalk him.  On February 25, 2000, Lewellyn recanted his perjury that Dr. Pearce had stalked him.  However, in the same document, he falsely testified that the newspaper articles referred to above truthfully stated what Plaintiff had done

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

to Stuart.

75.    As a result of the TRO against Dr. Pearce, Dr. Pearce was placed under guard when he entered the courthouse.  The chaperoning by guards, the threats by Alexander's attorneys, and the TRO intimidated Dr. Pearce.  He was afraid to attend the hearing.  As a consequence, Dr. Pearce was not able to expose Botha's perjury in support of a motion to deny Plaintiff the ability to present evidence in his lawsuit.  Botha had falsely testified in her moving papers that Dr.  Pearce had violated a court order by writing an intentionally bad check. As a result of Botha's perjury and Dr. Pearce's fear of exposing it at the hearing, Dr.  Pearce was sanctioned in such a way as to prevent him from presenting any material evidence in support of his defamation lawsuit.

76.    The Acupuncture Board received a copy of the TRO.  The board responded to notice of the TRO by moving the Santa Clara Superior Court to allow it access to the reports of Alexander's psychologists, Diana Everstine and Louis Everstine.  The court granted the motion on June 26, 2000.

77.    On July 10, 2000, at trial on the TRO, Alexander's claims in his TRO were exposed as a fabrication.  During the hearing, psychologist Louis Everstine was revealed to have been diagnosed as having a paranoid and narcissistic personality disorder, to have stalked a married woman for five years, and having been disciplined by the Psychology Board for these two facts.  He was also exposed as having falsified his testing and having projected his own personality disorder on plaintiff.  The Everstines were also revealed to have destroyed 51 minutes of Diana Everstine's audio tape of her interview of plaintiff.  Contained in the 51 minutes of missing recording was plaintiff's description of Pinelli's assault, Williams' letter, and plaintiff discussing his fear of further exposing perjury made by Alexander or his lawyers.

78.    Oral argument on plaintiff's appeals occurred in November 2000.  At

**28**

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

oral argument on plaintiff's appeal of revocation of his license, the appellate judges indicated that they were considering reversing the judgment and ordering a trial on the Chiropractic Board decision.  Romeo and her superiors became concerned that Romeo's lies to Judge Lew and Alexander's perjury would be exposed at the trial, that the judgment would be reversed, allowing plaintiff to sue Chiropractic Board, Sullivan, Romeo, Sharp, for violating plaintiff's rights as alleged herein by, among other things, coaching Morrow to change her testimony, fabricating Sullivan's report, destroying their investigative file while it was under subpoena, prosecuting plaintiff for having obeyed the law, vindictively raising the penalty against plaintiff, suborning Alexander to commit perjury against plaintiff, and having Dr. Pearce searched under false pretenses.

79.    To defend their actions, Romeo and her superiors, Vivien Hersh and Susan Meadows, (Romeo and Supervisors) devised a scheme to have Dr. Pearce found mentally disordered.  Romeo and Supervisors demanded from the Everstines, their records of their examination of Dr. Pearce.

80.    Fearing that their records would show that they fabricated their diagnosis of plaintiff, that they had destroyed part of their audiotape of Dr. Pearce's  interview  and falsely conspired to move for a TRO without probable cause, the Everstines refused to turn over their records of their testing and interview to the Acupuncture Board for review.  Alexander advised them not turn over the records.  Alexander's first purpose was to force the Acupuncture Board to do an independent examination of Dr.  Pearce, thereby providing him an affirmative defense for malicious prosecution under California Law.  Alexander's second purpose was to help protect himself and the Everstines from discipline for having conspired with him to fabricate a report and falsely move for a TRO.

81.    Romeo and Supervisors recruited a psychologist to claim that the existence of the TRO and the Everstine's report was alone enough to warrant an

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

examination of plaintiff.  On December 14, 2000, AG defendants prevailed upon Acupuncture Board to order Plaintiff to be examined by defendant psychologist Peter Berman ("Berman").  AG defendants chose Berman because they knew Berman was not qualified to make a forensic analysis of plaintiff and would interpret whatever tests he performed in ways favorable to AG's ends regardless of whether the testing actually supported AG's purposes.

82.    To enable Berman to fabricate what Dr.  Pearce stated to Berman, AG defendants by and through defendants Meadows and Lawrence Mercer ("Mercer") forbade plaintiff from audiotaping Berman's examination of him on threat of automatically revoking his license to practice acupuncture if Dr. Pearce attempted to do so.  Berman fabricated his diagnosis by, among other things, claiming Dr.  Pearce had been assertive and demanding when, in fact, he had been accommodating to Berman's every demand; falsely reported about Dr. Pearce's tone, demeanor and answers to his questions, and claimed Dr. Pearce's pictures showed he was mentally ill because he had not drawn a landscape for two of the pictures, when, in fact, Berman had taken them from Dr. Pearce before Dr.  Pearce could finish them, and by claiming testing was consistent with his diagnosis when, in fact, the testing showed Dr.  Pearce did not have the diagnosis Berman assigned to Dr.  Pearce.  Using the Everstine report as a model, Berman claimed Dr.  Pearce had a paranoid and narcissistic personality that would cause him to attack his patients with lawsuits and prevented him from admitting the Chiropractic Board's claims against him. Berman also claimed Dr. Pearce showed poor judgment in treating patients while defending his name through the courts.  Berman ignored the fact that Dr.  Pearce had told him he had wound down his practice in anticipation of quitting practice.

83.    On January 8, 2001, Dr. Pearce prevailed in the appeal of the

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

revocation of his license by the Chiropractic Board.  A remand hearing was scheduled for May 21, 2001.   To prejudice the remand hearing, Berman produced the custom-ordered report at the instance of the AG defendants claiming Dr. Pearce was mentally unfit to practice acupuncture.  Berman's sole evidence was the former existence of the TRO, his lies about what plaintiff said to him, and his deliberate misinterpretations of and lies about the testing he performed on plaintiff.  Berman intentionally ignored all evidence presented to him that showed Dr. Pearce was normal, claiming that he, Berman, could not understand it.  Berman relied heavily on the fact that the Everstine report had been used to obtain a TRO as evidence that the Everstine report supported his conclusions.

84.   On March 22, 2001, AG defendants moved for an emergency order declaring plaintiff unfit to practice.  Administrative Law Judge Jonathon Lew (by now no longer PLJ) denied the request.

85.   The remanded trial of the accusations against Dr. Pearce's chiropractic license was presided over by the Honorable Judge Thomas Edwards.  The remand hearing was held in Santa Clara County Superior court on May 21, 2001 and June 15, 2001.

86.   During remand hearing, Lloyd Paris ("Paris"), the AG attorney representing the Chiropractic Board, insisted that nothing improper had occurred when Romeo had Dr. Pearce searched.  Plaintiff presented new evidence that Romeo had fabricated evidence to obtain both orders to have a peace officer at the hearings on plaintiff's chiropractic license.

87.   Paris admitted during the trial that Chiropractic Board had no cause for punishing Dr. Pearce for having an attitude.  The court determined that plaintiff's examinations and procedures were in accord with Chiropractic Board's own licensing examination requirements.  The court further determined that

**31**

plaintiff had not been given notice, as required by due process that he could be punished for an attitude, or that consent by any of the patients he examined was an issue on which he had to defend. The court stated, furthermore, that the evidence on consent and attitude was insufficient to sustain the Chiropractic Board's decision. Dr. Pearce had presented no evidence in defense of these claims.

88. On July 5, 2001, the Everstines, through sworn affidavit made out by Diana Everstine, admitted that they received information previously denied them by Alexander's attorneys and on that basis, repudiated their own report.

89. On September 6, 2001, the Superior Court issued its writ restoring plaintiff's license to practice chiropractic and terminating *Chiropractic Board v. Pearce*.

90. Chiropractic Board did not take an appeal of the writ. Thus, the decision of the Superior Court became final and Plaintiff exhausted his administrative remedies before said agency.

91. Dr. Pearce informed Berman that he, Plaintiff herein, had prevailed in the Chirorpactic Board disciplinary proceedings, that Diana Everstine repudiated her own report, that the Everstines had destroyed 51 minutes of their taped interview of Pearce, and that Ed Cullen, an attorney for Alexander who had obtained the Everstine report, had himself concluded that the Everstine's report was unsupportable. However, the AG defendants, pressed forward with their campaign to revoke plaintiff's acupuncture license based on Berman's fabricated report and a report based on the Everstine report.

92. The hearing on Dr. Pearce's acupuncture license occurred for eight days between January 28 and February 8, 2002. The hearing was before ALJ Jonathon Lew. On the first day of trial, ALJ Lew stated on the record as judge that he had never ordered a search of plaintiff in the *Chiropractic Board v.*

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

*Pearce* hearings.

93.    Berman testified that he had not relied upon the Everstine report in coming to his conclusions about Dr. Pearce.  Berman's testimony that his testing supported his diagnosis was exposed as false.  Dr. Pearce presented competent expert witnesses that plaintiff was not mentally ill.  Ed Cullen, Alexander's former attorney, testified that had not believed the Everstine report and that Dr. Pearce exhibited an unusual amount of calm and professionalism even when he had been threatened by his colleagues, had lost his ability to present evidence in his defamation suit, and had lost the malicious prosecution action due to his attorney, Thomas Hogan settling the Alexander lawsuit without his consent.  Mr. Cullen also testified that he had developed a sincere respect for Dr. Pearce while defending Alexander.  Plaintiff submitted over 100 affidavits from patients, colleagues, teachers, and physicians; all of whom testified that plaintiff did not exhibit any signs or symptoms of having a mental illness.  Dr. Pearce's lawyers in *Chiropractic Board v. Pearce* testified in the Acupuncture Board hearing that they had warned Dr. Pearce that Berman and the Attorney Generals' Office was "out to get him."  Mr. Castro, Dr. Pearce's trial attorney in the Chiropractic Board matter, testified that he became personally convinced that the Chiropractic Board had decided to revoke Dr. Pearce's license regardless of the evidence presented in the trial.

94.    ALJ Lew found in favor of Dr. Pearce, pointing out some of Berman's self-contradictions in the body of his decision.  Acupuncture Board adopted Judge Lew's decision effective on May 16, 2002.

95.    AG defendants did not move for a writ to overturn Acupuncture Board's decision within the statutory time period to do.  Hence, Judge Lew's decision has become final and Dr. Pearce has exhausted all administrative remedies for actions before said agency.

**33**

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

**FIRST CLAIM FOR DAMAGES AGAINST ROMEO FOR**

**VIOLATION OF 42 U.S.C. SECTION 1983**

96.    Plaintiff realleges and incorporates by reference the allegations in paragraphs one through 95.

97.    As alleged, Romeo violated the right of plaintiff to due process by fabricating evidence for use in the hearings on his chiropractic license and making a false statement that Plaintiff had stalked and harassed witnesses.

98.    As alleged in paragraph 42, Romeo presented her first ex parte false and fabricated evidence without notice to Dr. Pearce. As a result, he never had an opportunity to respond to or defend against her fabricated evidence.

99.    This action violated Dr. Pearce's right to due process of law as guaranteed by the United States Constitution, a violation of 42 U.S.C. 1983. Since Romeo's actions were police actions, not prosecutorial actions, she has no claim for prosecutorial immunity. The law was well settled before 1995 that fabrication of evidence for use in a trial against an accused in administrative settings is a violation of the accused rights under the Constitution of the United States. Hence, Romeo has no claim for immunity that could shield her for liability for this claim for damages.

100.    As alleged in paragraphs 42 through 44, Romeo and other defendants herein fraudulently concealed Romeo's fabrication of evidence. As a direct and proximate result of said fraudulent concealment, Plaintiff was unable to discover the fact that Romeo had fabricated evidence until April 2001. Hence, this claim for damages did not, and could not have, accrued until April 2001, less than four years prior to the filing of this lawsuit.

101.    As a direct and proximate result of the conduct alleged herein, Plaintiff suffered special and general damages in an amount according to proof before a jury.

**34**

---

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

102.   As alleged herein, Romeo's conduct was malicious, fraudulent, and oppressive.  Accordingly, Plaintiff is entitled to punitive and exemplary damages in an amount to be determined by jury.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

## SECOND CLAIM FOR DAMAGES AGAINST ROMEO FOR
## VIOLATION OF 42 U.S.C. 1983

103.   Plaintiff realleges and incorporates by reference the allegations in paragraphs one through 95.

104.   As alleged, Romeo abused her authority as a prosecutor to claim she had an order to have Plaintiff searched when she knew she had no such authority and no probable cause for ordering such a seizure and search.  Utilizing her false claim of authority, she caused Plaintiff to be seized and searched.  Hence, the seizure and search of Plaintiff was in violation of the Fourth Amendment to the United States Constitution, a violation of 42 U.S.C. 1983.  The law was well settled in 1995 that such illegal search and seizures violate citizen's rights under the Fourth Amendment to the United States  Constitution.  As a prosecutor, Romeo was charged with the responsibility for not violating the rights of citizens situated as Dr.  Pearce was.  Hence, Romeo  is not shielded by any doctrine of immunity from liability for this claim for damages.

105.   As alleged in paragraphs 42  through 44 and 92, Romeo, Sharp  AG defendants, and Romeo's Supervisors fraudulently concealed Romeo's lack of authority to order Dr.  Pearce searched.  As a direct and proximate result of said fraudulent concealment, plaintiff was unable to discover that Romeo had no authority to order the seizure and search of plaintiff.  As alleged in paragraph 92, on January 28, 2001, Plaintiff made a serendipitous discovery that Romeo did not have the authiorty to have Plaitniff searched.

**35**

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

106.  As a direct and proximate result of the conduct alleged herein, Plaintiff suffered special and general damages in an amount according to proof before a jury.

107.  As alleged herein, Romeo's conduct was malicious, fraudulent, and oppressive.  Accordingly, Plaintiff is entitled to punitive and exemplary damages in an amount to be determined by jury.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

### THIRD CLAIM FOR DAMAGES AGAINST SHARP AND UNKNOWN PEACE OFFICER FOR VIOLATION OF 42 U.S.C. 1983.

108.  Plaintiff realleges and incorporates by reference the allegatioins of paragraphs one through 95.

109.    As alleged in paragraph 43, Sharp conducted an illegal seizure and search of Dr.  Pearce with the aid of a uniformed peace officer armed with a baton and pistol.  Plaintiff saw that a refusal to submit to the  seizure and search of his person by Sharp would result in violence against him by thse defendants.  Moreover, Plaintiff was convinced by Romeo, Sharp, and unknown peace officer that failure to acquiesce to the seizure and search of his person could result in confinement in prison and further legal proceedings at his expense for violation of a court order that, in fact, had not been issued.

110.  Sharp knew that he did not have a valid order.  Shapr destroyed his file to cover up the fact that he did never had a valid order to have conducted the seizure and search of Dr.  Pearce.  Romeo, who knew that she had no probable cause to order the search, and Board Officers aided this cover-up by refusing to enforce the subpoena of Sharp's files.  As a direct and proximate result of this fraudulent cover up, Plaintiff was unable to discover that no valid order existed to allow the search and seizure of his person until he discovered made a

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

serendipitouslyon January 28, 2001, that there was not order.  Hence, this cause of action did not, and could not have accrued until January 28, 2001, less than four years before the filing of this civil action.

111.   Sharp and Unknown Peace Officer had an affirmative duty to enquire as to the existence of a valid judicial order or probable cause to conduct the seizure and search of Dr.  Pearce's person.  Neither of said defendants made such an inquiry before seizing and searching Dr.  Pearce's person.  Instead, Sharp fraudulently concealed the fact that he had no authority to conduct said seizure and search.  Said conduct was malicious, fraudulent and oppressive.  Hence, Plaintiff is entitled to punitive damages.

112.   The law was well settled before the seizure and search of plaintiff occurred that such conduct violated Plaintiff's civil rights.  Hence, every reasonable government official was on notice that such conduct constituted a violation of 42 U.S.C. 1983.

113.   As a direct and proximate result of the conduct alleged herein, Plaintiff suffered special and general damages in an amount according to proof.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

### FOURTH CLAIM FOR DAMAGES FOR ASSAULT AND BATTERY AGAINST ROMEO, SHARP, AND UNKNOWN PEACE OFFICER

114.   Plaintiff realleges and incorporates paragraphs one through 95, 43, and 44, as if fully set forth.

115.   Defendants pat down searches of Plaintiff were unauthorized by judicial authority, not supported by probable cause and occurred only under threat of legal process.  As such, said defendants' touching of Plaintiff was an assault and battery upon his person carried out under false pretense of authority of law.

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

116.  As a direct and proximate result of the cover-up of the fact that no official act sanctioned Defendants conduct alleged herein, Plaintiff was unable to discover, and did not discover that the assault and battery upon his person was without official sanction, and therefore actionable until January 28, 2001. Plaintiff presented a Tort Claim to the State of California Board of Control based upon these facts on March 4, 2001.  Said claim was rejected by said agency on in May 2002.

117.  Defendants' conduct, as alleged herein was malicious, fraudulent and oppressive.  Hence Plaintiff is entitled to punitive and exemplary damages according to proof..

118.  As a direct and proximate result of the conduct alleged herein, Plaintiff suffered special and general damages in an amount according to proof. Wherefore, Plaintiff prays fo rjudgment as hereinafter set forth.

## FIFTH CLAIM FOR DAMAGES FOR VIOLATION OF CALIFORNIA CIVIL CODE SECTIONS 52.1, 51.7, AND PURSUANT TO CALIFORNIA CIVIL CODE SECTION 52 AGAINST ROMEO, SHARP, AND UNKNOWN PEACE OFFICER.

119.  Plaintiff realleges and incorporates paragraphs 42 through 44,  as if fully set forth.

120.  California Civil Code Section 52.1 states in relevant part:

(a) If a person or person, whether or not acting under color of law, interferes by threats, intimidation, coercion, or attempts to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state, the Attorney General, or any

**38**

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

district attorney or city attorney may bring a civil action for injunctive and other appropriate equitable relief in the name of the people of the State of California, in order to protect the peaceable exercise or enjoyment of the right of rights secured.

(b) any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of the state, has been interfered with, or attempted to be interfered with, as described in subdivision (a), may institute an prosecute in his or her own name and on his or her own behalf a civil action for damages, including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured.

121.  California Civil Code Section 52 states in relevant part:

(b) Whoever denies the right provided by Section 51.7 or 51.9, or aids, incites, or conspires in that denial, is liable for each and every offense for the actual damages suffered by any person denied that right and

(1) An amount to be determined by a jury, or a court sitting without a jury, for exemplary damages.

(2) A civil penalty of twenty-five thousand dollars($25,000) to be awarded to the person denied the right provided by Section 51.7 in any action brought by the person denied the right, or by the Attorney General, a district attorney, or a city attorney.

(h) for the purposes of this section, "actual damages" means special and general damages.  This subdivision is declaratory of existing law.

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

122.   California Civil Code Section 51.7 states in relevant part:

(a) All persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of their race, color, religion, ancestry, national origin, political affiliation, sex, sexual orientation, age, disability, or position in a labor dispute, or because another person perceives them to have one or more of those characteristics.   The identification in this subdivision of particular bases of discrimination is illustrative rather than restrictive.

123.   As alleged herein, Plaintiff was intimidated and coerced under color of law by threat of violence by defendants Romeo, Sharp, and Unknown Peace Officer into suffering a battery upon his person and a denial of his rights to be free from illegal seizures and searches as guaranteed by the Fourth Amendment of the Unites States Constitution and by the California Constitution.   Hence, Plaintiff is entitled to special damages and general damages, exemplary damages according to the decision of the jury, a civil fine of $25,000.00 against each defendant and in favor of Plaintiff, and attorneys fees as determined by the court.

124.   As a direct and proximate result of the fraudulent concealment by defendants of the fact that no authority for their action against plaintiff existed, Plaintiff was unable to discover that he had these causes of action against these defendants until January 28, 2002.  Plaintiff filed a Tort claim based upon these facts with the California State Board of Control which was rejected in May  2002.  Accordingly, this claim for damages is timely.

125.   The California Unruh Civil Rights Act, of which the sections of California Law quoted herein are a part, was enacted in 1987.

126.   Defendants concealment of the facts giving rise to this cause of

**40**

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

action, being fraudulent and oppressive against Dr. Pearce's rights as secured by this statute, gives this court cause to award punitive and exemplary damages as deterrence of future fraudulent concealment by state actors similarly situated.

127. As a direct and proximate result of the actions of defendants herein alleged, Plaintiff suffered special and general damages in an amount according to proof.

Wherefore, Plaintiff prays for relief as hereinafter set forth.

### SIXTH CLAIM FOR DAMAGES FOR MALICIOUS PROSECUTION AGAINST STUART, LOVE, LEVIN, GUY, FULTON, YONTS, YONTS & FULTON, AND ALEXANDER

128. Plaintiff realleges and incorporates paragraphs one through 95, as if fully set forth herein.

129. As alleged, said defendants, and each of them, instigated and prosecuted Stuarts' false claims against Plaintiff before the Chiropractic Board for the motives of protecting Stuart, Love, and Levin from exposure of their insurance fraud and for the purpose of creating monetary recovery for their false claims against Stuart's workers' compensation carrier.

130. As a direct and proximate result of defendants' and each of their actions alleged herein, Plaintiff suffered physical injury, and special and general damages according to proof.

131. Said defendants actions, and each of their actions, as alleged, were malicious, fraudulent, oppressive and in furtherance of the commission of a crime. Hence Plaintiff is entitled to punitive damages.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

### SEVENTH CLAIM FOR DAMAGES FOR VIOLATION OF 42 U.S.C. 1983 AND 1985 AGAINST DAVIS AND SHARP

132. Plaintiff realleges and incorporates herein paragraphs one through

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

95, 29 through 30, as if fully set forth.

133.  As alleged, Davis and Sharp solicited and induced Defendant C. Brett Sullivan to fabricate evidence.  Sullivan did fabricate evidence for use in Chiropractic Board v.  Pearce.

134.  Before the time they engaged in these acts, the law was well settled that these acts were in violation of the due process protections of the United States Constitution.

135.  As a direct and proximate cause of these acts, Plaintiff was forced to defend his name, and his ability to practice his profession until September 6, 2001.  Plaintiff suffered loss of his license to practice his profession for two years and other special and general damages in an amount according to proof.

136.  Defendants' fraudulent concealment of their actions was malicious and oppressive.  Accordingly, Plaintiff is entitled to punitive damages according to proof.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

## EIGHTH CLAIM FOR DAMAGES AGAINST DEFENDANT
## SULLIVAN FOR VIOLATION OF 42 U.S.C. 1983

137.  Plaintiff realleges and incorporates herein paragraphs one through 95, and in particular paragraph 31, as though fully set forth.

138.  Sullivan agreed to fabricate his report so as to hide his ignorance and lack of expertise in the matter he was asked to testify in Chiropractic Board v. Pearce.

139.   Before the time he engaged in these acts, the law was well settled that these acts were in violation of the due process protections of the United States Constitution.

140.  As a direct and proximate cause of these acts, Plaintiff was forced to defend his name, and his ability to practice his profession until September 06,

**42**

---

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

2001.  Plaintiff suffered loss of his license to practice his profession for two years and other special and general damages in an amount according to proof.

141.  Defendants' fraudulent concealment of his actions was malicious and oppressive.  Accordingly, Plaintiff is entitled to punitive and exemplary damages according to proof.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

### NINTH CLAIM FOR DAMAGES AGAINST DEFENDANT
### SULLIVAN FOR MALICIOUS PROSECUTION

142.  Plaintiff realleges and incorporates paragraphs one through 95, and in particular paragraph 30, as if fully alleged herein.

143.  As alleged, Sullivan joined in the instigation and prosecution of Plaintiff without probable cause for having performed a rectal examination of Stuart and for making a correct diagnosis of Stuart.  Sullivan did these things in order to promote his political view.  Sullivan's action was malicious toward Plaintiff in that he knew his actions would damage Pearce.

144. As a direct and proximate cause of Sullivan's actions, Dr.  Pearce suffered special and general damages according to proof.

145.  Sullivan's action was fraudulent, malicious and oppressive.  Hence, Plaintiff is entitled to punitive damages.

Wherefore Plaintiff prays for judgment as hereinafter set forth.

### TENTH CLAIM FOR DAMAGES FOR VIOLATION OF U.S.C.
### 1985 BY DAVIS, SULLIVAN, AND SHARP

146.  Plaintiff realleges and incorporates paragraphs one through 95, and in particular paragraphs 29 thorugh 30, as if fully alleged herein.

147.  As alleged, these defendants engaged in a conspiracy to violate 42 U.S.C. 1983 and did carry out said conspiracy.

148.  As a direct and proximate result of said defendants' actions, plaintiff

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

suffered special damages including but not limited to physical injury of an ulcer requiring medical treatment and loss of liberty and property interest in an amount according to proof.

149.   Defendants actions were fraudulent, malicious, and oppressive. Hence, Plaintiff is entitled to punitive and exemplary damages in an amount to be determined by a jury.

Wherefore, plaintiff prays for judgment as hereinafter set forth.

## ELEVENTH CLAIM FOR DAMAGES AGAINST DEFENDANT SHARP FOR VIOLATION OF 42 U.S.C. 1983.

150.   Plaintiff realleges and incorporates herein paragraphs one through 95, and in particular paragraph 46, as if fully alleged.  As alleged Sharp induced Defendant Scheffer to fabricate a story for use as evidence against Dr.  Pearce in State Board of Chiropractic Examiners v. Pearce.  Upon obtaining said fabrications, Sharp incorporated the fabrications into a report upon which he knew Chiropractic Board would commence an action against Pearce.  He then concealed the fact that his report contained these fabrications by among other things, concealing the fact that Scheffer had changed her story to suit his purposes and had agreed to present the fabricated story, at his request, as evidence against Dr.  Pearce in said proceedings.  He then falsely testified to the validity of Scheffer's perjury.  Then, to prevent discovery of his act, he destroyed his investigative file and notes rather than let them be discovered through the subpoena power of the Chiropractic Board.

151.   Before the time he engaged in these acts, the law was well settled that these acts were in violation of the due process protections of the United States Constitution.

152.   As a direct and proximate cause of these acts, Plaintiff was forced to defend his name, and his ability to practice his profession until September 06,

**44**

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

2001.  Plaintiff suffered loss of his license to practice his profession for two years and other special and general damages in an amount according to proof.

153.  Defendants' fraudulent concealment of his actions was malicious and oppressive.  Accordingly, Plaintiff is entitled to punitive damages.  Defendants' fraudulent concealment resulted in the statute of limitations to prosecute him for perjury passing before his crime could be discovered and prosecuted.  Hence, this court has a duty to award exemplary damages so as to deter other peace officers from engaging in the same sort of reprehensible cover-up of their wrongdoings.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

## TWELFTH CLAIM FOR DAMAGES FOR MALICIOUS PROSECUTION AGAINST SCHEFFER

154.  Plaintiff realleges and incorporates paragraphs 45 and 46, as if fully set forth.

155.  As alleged, Scheffer falsely instigated and prosecuted claims of wrongdoing by Dr.  Pearce before the Chiropractic Board.  Scheffer knew these claims were false.  Scheffer did not have a motive of assisting the Chirorpactic Board in  determining Plaintiff's fitness to practice chiropractic.  Her motive was to cover-up her own insurance fraud.

156.  As a direct and proximate result of Scheffer's conduct, Plaintiff incurred special and general damages according to proof including but not limited to treatment for physical injury in the form of an ulcer, the expense of defending against her claims, loss of his license to practice chiropractic for two years, loss of business and business relations, loss of goodwill in his business, loss of economic opportunities, and general damages according to proof.

157.  Scheffer's conduct as alleged herein was malicious, fraudulent, and oppressive.  Hence, Plaintiff is entitled to punitive and exemplary damages

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

according to proof.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

## THIRTEENTH CLAIM FOR DAMAGES AGAINST SCHEFFER
## FOR VIOLATION OF 42 U.S.C. 1983

158.   Plaintiff realleges and incorporates paragraphs one through 45, 46, and 54 as fully set forth herein.

159.   As alleged, Scheffer's fabrication of evidence at the request of Sharp was a violation of 42 U.S.C. 1983 in that it was a violation of Plaintiff's rights not to be prosecuted without probable cause by evidence fabricated at the behest of the state.  That this sort of behavior is a violation of plaintiff's civil rights was well established prior to 1995.

160.   As a direct and proximate result of Scheffer's conduct, Plaintiff incurred special and general damages according to proof including but not limited to treatment for physical injury in the form of an ulcer, the expense of defending against her claims, loss of his license to practice chiropractic for two years, loss of business and business relations, loss of goodwill in his business, loss of economic opportunities, and general damages according to proof.

161.   Scheffer's conduct as alleged herein was malicious, fraudulent, and oppressive.  Hence, Plaintiff is entitled to punitive damages.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

## FOURTEENTH CLAIM FOR DAMAGES FOR VIOLATION OF
## 42 U.S.C. 1985 AGAINST SCHEFFER AND SHARP.

162.   Plaintiff realleges and incorporates paragraphs one through 44, 45, 46 and 54, as if fully set forth.

163.   As alleged, the actions of Sharp and Scheffer and agreement to carry out said actions constitute a conspiracy as defined by 42 U.S.C. 1985.

164.   As a direct and proximate result of said conspiracy, Plaintiff incurred

**46**

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

special and general damages according to proof including but not limited to treatment for physical injury in the form of an ulcer, the expense of defending against her claims, loss of his license to practice chiropractic for two years, loss of business and business relations, loss of goodwill in his business, loss of economic opportunities, and general damages according to proof.

165.  Scheffer's and Sharp's conduct as alleged herein was malicious, fraudulent, and oppressive.  Hence, Plaintiff is entitled to punitive damages.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

## FIFTEENTH CLAIM FOR DAMAGES AGAINST DEFENDANT SHARP FOR VIOLATION OF 42 U.S.C. 1983.

166.  Plaintiff realleges and incorporates herein paragraphs one through 47, 49, and 53, as if fully set forth.

167.  As alleged Sharp induced Defendant Brickman to fabricate a story for use as evidence against Dr.  Pearce in State Board of Chiropractic Examiners v. Pearce.  Upon attaining said fabrications, Sharp incorporated the fabrications into a report upon which he knew Chiropractic Board would commence an action against Pearce.  He then concealed the fact that his report contained these fabrications by among other things, concealing the fact that records in his possession showed Brickman's story did not occur as she alleged and that she agreed to present the fabricated story, at his request, as evidence against Dr. Pearce in said proceedings.  He then falsely testified to the validity of Brickman's false accusations.   Then, to prevent discovery of his act, he destroyed his investigative file and notes rather than let them be discovered through the subpoena power of the Chiropractic Board.

168.  Before the time he engaged in these acts, the law was well settled that these acts were in violation of the due process protections of the United States Constitution.

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

169.  As a direct and proximate cause of these acts, Plaintiff was forced to defend his name, and his ability to practice his profession until September 06, 2001.  Plaintiff suffered loss of his license to practice his profession for two years and other special and general damages in an amount according to proof.

170.  Defendants' fraudulent concealment of his actions was malicious and oppressive.  Accordingly, Plaintiff is entitled to punitive damages.  Defendants' fraudulent concealment resulted in the statute of limitations to prosecute him for perjury passing before his crime could be discovered and prosecuted.  Hence, this court has a duty to award exemplary damages so as to deter other peace officers from engaging in the same sort of reprehensible cover-up of their wrongdoings.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

## SIXTEENTH CLAIM FOR DAMAGES AGAINST BRICKMAN
## FOR MALICIOUS PROSECUTION

171.  Plaintiff realleges and incorporates by reference the allegations of paragraphs 47, 53, as if fully set forth.  As alleged, Brickman falsely instigated and prosecuted claims of wrongdoing by Dr.  Pearce before the Chiropractic Board.  Brickman knew these claims were false.  Brickman did not have a motive of assisting the Chiropractic Board in  determining Plaintiff's fitness to practice chiropractic.  Her motive was to retaliate against Plaintiff for having sent her to collections.

172.  As a direct and proximate result of Brickman' conduct, Plaintiff incurred special and general damages according to proof including but not limited to treatment for physical injury in the form of an ulcer, the expense of defending against her claims, loss of his license to practice chiropractic for two years, loss of business and business relations, loss of goodwill in his business, loss of economic opportunities, and general damages according to proof.

**48**

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

173.   Brickman's conduct as alleged herein was malicious, fraudulent, and oppressive.  Hence, Plaintiff is entitled to punitive damages.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

/

/

**SEVENTEENTH CLAIM FOR DAMAGES AGAINST BRICKMAN**
**FOR VIOLATION OF 42 U.S.C. 1983.**

174.   Plaintiff realleges and incorporates paragraphs 47, 53, as if fully set forth.

175.   As alleged, Brickman's fabrication of evidence at the request of Sharp was a violation of 42 U.S.C. 1983 in that it was a violation of Plaintiff's rights not to be prosecuted without probable cause by evidence fabricated at the behest of the state.  That this sort of behavior is a violation of plaintiff's civil rights was well established prior to 1995.

176.   As a direct and proximate result of Brickman's conduct, Plaintiff As a direct and proximate result of Brickman's conduct, Plaintiff incurred special and general damages according to proof including but not limited to treatment for physical injury in the form of an ulcer, the expense of defending against her claims, loss of his license to practice chiropractic for two years, loss of business and business relations, loss of goodwill in his business, loss of economic opportunities, and general damages according to proof.

177.   Brickman's conduct as alleged herein was malicious, fraudulent, and oppressive.  Hence, Plaintiff is entitled to punitive damages.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

**EIGHTEENTH CLAIM FOR DAMAGES FOR VIOLATION OF 42**
**U.S.C. 1985 AGAINST BRICKMAN AND SHARP.**

178.   Plaintiff realleges and incorporates paragraphs 47 and 53, as if fully

**49**

---

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

set forth.

179.  As alleged, the actions of Sharp and Brickman and agreement to carry out said actions constitute a conspiracy as defined by 42 U.S.C. 1985.

180.  As a direct and proximate result of said conspiracy, plaintiff As a direct and proximate result of Brickman's conduct, Plaintiff incurred special and general damages according to proof including but not limited to treatment for physical injury in the form of an ulcer, the expense of defending against her claims, loss of his license to practice chiropractic for two years, loss of business and business relations, loss of goodwill in his business, loss of economic opportunities, and general damages according to proof.

181.  Brickman's and Sharp's conduct as alleged herein was malicious, fraudulent, and oppressive.  Hence, Plaintiff is entitled to punitive damages.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

## NINETEENTH CAUSE OF ACTION AGAINST SHARP FOR VIOLATION OF 42 U.S.C. 1983.

182.  Plaintiff realleges and incorporates paragraphs 48, 49,  and 55, as if fully set forth.

183.  As alleged, Sharp induced Morrow to fabricate a evidence that Morrow had been subjected to a breast examination by Dr.  Pearce which did not occur.   Sharp then incorporated said fabrication into his report for use in prosecuting Dr.  Pearce.

184.  Then, to prevent discovery of his act, he destroyed his investigative file and notes rather than let them be discovered through the subpoena power of the Chiropractic Board.

185.  Before the time he engaged in these acts, the law was well settled that these acts were in violation of the due process protections of the United States Constitution.

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

186.   As a direct and proximate cause of these acts, Plaintiff was forced to defend his name, and his ability to practice his profession until September 06, 2001.  Plaintiff suffered loss of his license to practice his profession for two years and other special and general damages in an amount according to proof.

187.   Defendants' fraudulent concealment of his actions was malicious and oppressive.  Accordingly, Plaintiff is entitled to punitive and exemplary damages according to proof.  Defendants' fraudulent concealment resulted in the statute of limitations to prosecute him for perjury passing before his crime could be discovered and prosecuted.  Hence, this court has a duty to award exemplary damages so as to deter other peace officers from engaging in the same sort of reprehensible cover-up of their wrongdoings.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

**TWENTIETH CLAIM FOR DAMAGES AGAINST ROMEO, SHARP, ALEXANDER, STUART, AND LEVIN FOR DEFAMATION IN CONNECTION WITH VIOLATION OF 42 U.S.C. 1983 AND VIOLATION OF 42 U.S.C. 1985**

188.   Plaintiff realleges and incorporates paragraphs 33 through 39, as if fully set forth.

189.   As alleged, defendants Romeo, Sharp, Alexander, Stuart, Levin, and each of them, agreed to plant articles in the San Francisco Examiner and San Jose Mercury News so as to defame plaintiff and utilize said defamation to produce additional complainants against Plaintiff.  The agreement was carried out by Romeo, Levin, Stuart, and Alexander by placing articles in the San Francisco Examiner and San Jose Mercury News which Dr.  Pearce.  In furtherance of said agreement, said defendants arranged to have Sharp interview each such respondent to the newspaper articles and convince each respondent to become a complaining witness against Plaintiff.  Sharp, as alleged in

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

paragraphs 46, 47, and 48 did interview respondents and convinced them to fabricate evidence against Dr. Pearce that Romeo and Sharp then utilized to prosecute Dr. Pearce. Thus, Sharp utilized the defamation by Romeo, Levin, Stuart, and Alexander to prosecute Dr. Pearce and damage him. As such, these acts of defamation were carried out in connection with prosecuting Dr. Pearce without probable cause.

190. By engaging in these activities, defendants denied Plaintiff equal protection under the laws enjoyed by all others of not being subjected to defamation in order to conjure up baseless charges upon which to deprive Plaintiff of his liberty and property interest in practicing his profession.

191. As a direct and proximate result of these actions, Plaintiff suffered physical injury in the form of an ulcer for which he obtained medical treatment, suffered loss of goodwill in his business, suffered expenses in defending against the prosecutions that the defamation engendered, and lost his property and liberty interests in maintaining his business and his chosen professional livelihood. Plaintiff suffered additional special and general damages according to proof.

192. Defendants actions were malicious, fraudulent, and oppressive. Accordingly, Plaintiff is entitled to punitive and exemplary damages according to proof.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

## TWENTY-FIRST CLAIM FOR DAMAGES AGAINST ROMEO, BOURKE, BENNET, AND CHIROPRACTIC BOARD OFFICERS FOR VIOLATION OF 42 U.S.C. 1986.

193. Plaintiff realleges and incorporates paragraphs one through 95, as if fully set forth.

194. Romeo, as the prosecutor in charge of Sharp's investigation was

**52**

---

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

privy to all that Sharp did in his investigation.  As a prosecutor, Romeo had a responsibility to abate conspiracies in violation of Civil Rights that occurred in investigations and prosecutions in which she was involved.  Romeo did not attempt to abate the conspiracies Sharp engaged in with witnesses.  Instead, she joined in the conspiracy which enabled the solicitation of fabricated evidence by Sharp.

195.   Wilbur Bennet ("Bennet") was Romeo's supervisor in the AG's office during the time that the conspiracy to defame Dr.  Pearce was formed and carried out and during the time Sharp utilized the defamation to fabricate evidence for used in Chiropractic Board v.  Pearce.  Under 42 U.S.C. 1986, Bennet had a duty to abate conspiracies engaged in by his subordinates.  Bennet did nothing to abate the conspiracy alleged herein.

196.   Robert Bourke ("Bourke") was Sharp's supervisor in the department of consumer affairs.  As Sharp's supervisor, Bourke had a duty to abate Sharp's participation in a conspiracy in violation of 42 U.S.C. 1985.  Bourke did nothing to abate the conspiracy.  Instead, he testified that Sharp's destruction of his file was within Department of Consumer Affairs policy!

197.   Chiropractic Board Officers, as the principals for whom Romeo and Sharp were agents, had a responsibility to abate conspiracies to violate 42 U.S.C. 1983 carried out in their name.  They did nothing to abate the conspiracy. Instead, when the conspiracies were called to their attention, they increased the penalty against Plaintiff without notice or an opportunity to be heard on whether his penalty should be increased.

198.   As a direct and proximate cause of the actions and inaction alleged herein, Plaintiff incurred special and general damages including but not limited to loss of his livelihood and in an amount according to proof.

199.   Said defendants' actions were malicious and oppressive.  Hence,

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

Plaintiff is entitled to punitive damages.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

## TWENTY-SECOND CLAIM FOR DAMAGES FOR VIOLATION OF 42 U.S.C. 1983 BY UNKNOWN AG AGENT.

200.   Plaintiff realleges paragraph 59,as if fully set forth.

201.   As alleged, an unknown agent for the AG solicited Lezlie Morrow to fabricate testimony that Plaintiff had molested her during an examination in 1983. Defendants then utilized said fabricated evidence to prosecute Plaintiff.

202.   As a direct and proximate cause of said conduct, Plaintiff incurred special and general damages according to proof.

203.   As alleged, said conduct was fraudulent, malicious, and oppressive. Hence, Plaintiff is entitled to punitive damages.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

## TWENTY-THIRD CLAIM FOR DAMAGES FOR VIOLATION OF 42 U.S.C. 1983 AGAINST ROMEO AND ZANE

204.   Plaintiff realleges paragraphs on through and 95 and 65 herein as if fully set forth.

205.   As alleged, Defendant Romeo fabricated evidence that Plaintiff had intimidated a witness during a break in the proceedings in the 1998 hearing on his license.   Defendant Romeo then presented said fabrication as her own witness statement to PLJ Lew.   As a result of said presentation, Plaintiff was again placed under guard when in presence of the trier of fact in *Chiropractic Board v. Pearce*.   Said conduct was calculated to prejudice said trier of fact.

206.   As a direct and proximate result of said conduct, Plaintiff incurred special and general damages according to proof.

207.   Said conduct was fraudulent, malicious, and oppressive.   Plaintiff requests punitive damages.

**54**

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

## TWENTY-FOURTH CLAIM FOR DAMAGES FOR VIOLATION OF 42 U.S.C. 1983 AND 42 U.S.C. 1985 AGAINST CHIROPRACTIC BOARD MEMBERS

208.  Plaintiff realleges and incorporates paragraphs one through 95,  as if fully set forth.

209.  As alleged, Chiropractic Board Members agreed to prosecute Dr. Pearce for making a correct diagnosis and performing an examination in accordance with law and the standard of care.  Said defendants in their initial accusation against Pearce stated the rectal examination of Stuart was not indicated.  This statement directly contradicted their position in their licensing examinations and also contradicted settled case law.  As such, this accusation was made without probable cause.  Said defendants, in paragraph F of their accusation claimed Dr.  Pearce's diagnosis was outside the standard of care even though this claim was directly contrary to the requirements of the law, their previous public statements, and their licensing examination.  As such, this accusation was instigated without probable cause.  Both accusations being contrary to law, were beyond the jurisdiction for Chiropractic Board Members to attempt.   Board Members were entirely without jurisdiction to instigate prosecution for obeying the law.

210.  As alleged, Chiropractic Board Members disciplined Dr.  Pearce for having not obtained proper consent for his examinations and treatments of the complaining witnesses without having given him notice of their intention to do so and without giving him an opportunity to be heard on this issue.

211.  As alleged, Chiropractic Board Members disciplined Dr.  Pearce for having an attitude they did not like even though Business and Professions code section 475(c) forbids discipline on this ground.  Since the law forbade such

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

action, Chiropractic Board Members were entirely without jurisdiction to create such discipline.  Chiropractic Board Members also disciplined Dr.  Pearce for having a social relationship with a family member of a patient.  This decision violated Dr.   Pearce's right of free association guaranteed by the First Amendment of United States Constitution.

212.  Chiropractic Board Members made their decision to discipline Dr. Pearce on these charges without giving him notice or an opportunity to be heard.

213.   As found in the Santa Clara County Superior Court in its decision on Plaintiff's writ of mandate in *Chiropractic Board v.  Pearce*, the Chiropractic Board Members violated Plaintiff's rights to due process by not giving him notice of their intention to enact this discipline against him.

214. When Plaintiff protested these decisions, Chiropractic Board Members raised the penalty against him without notice or an opportunity to be heard.

215.  Before Chiropractic Board Members committed this violation of Plaintiff's rights, the law was well settled that Chiropractic Board Members could not discipline Plaintiff without affording him notice and an opportunity to defend against the charges upon which the discipline was based, could not discipline him for exercising his rights of free association, and could not raise the penalty against him, without notice and an opportunity to be heard because he took obtained a writ of mandate for them to re-consider their decision in light of the substantive and due process arguments he made in his petition for the writ.  (One of the arguments was that the penalty was too high, not too low.)

216.  As a direct and proximate result of this conduct, Plaintiff suffered special damages, including but not limited to, physical injury of an ulcer for which he had medical care, loss of his business, loss of his livelihood, loss of economic relationships, loss of income, loss of business and other economic opportunities,

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

damage to his business goodwill, loss of his business, loss of his reputation and standing in the community, loss of ability to practice his profession, loss of his license, and loss of future earning capacity in an amount according to proof. Plaintiff suffered general damages in an amount according to proof.

217.  Defendants actions were malicious, fraudulent, and oppressive. Plaintiff requests punitive damages.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

## TWENTY-FIFTH CAUSE OF ACTION FOR CONSPIRACY TO VIOLATE CIVIL RIGHTS AGAINST ALL DEFENDANTS

218.  Plaintiff realleges and incorporates paragraphs one through 95, as if fully set forth.

219.  As alleged, defendants conspired to and did carry out their conspiracy, for various personal reasons, in an attempt to deprive Plaintiff of his livelihood, his liberty and property interest in practicing his profession and his right to the equal protection under the law of not being prosecuted on baseless charges or fabricated evidence; not being illegally seized and searched, assaulted and battered, coerced, threatened, or intimidated; not being defamed in the course of and for the purpose of being victimized by a conspiracy to be prosecuted without probable cause on evidence fabricated at the behest of the state; being subjected to discipline without notice or an opportunity to defend; or being subjected to vindictive increase of the penalty imposed upon him in response to his protesting the state's agents running amok on his rights.

220.  As alleged, defendants overwhelmed the protections of due process and fair court procedure by fraudulently concealing their conspiracy and by fraudulently concealing the illegality of the seizure and search of Plaintiff in front of a trier of fact until after all proceedings affected by their illegal activity were terminated.  Defendants circumvented the protections of due process and the

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

right to confront evidence presented against the accused by substituting the search of Plaintiff in front of the trier of fact in *Chiropractic Board v. Pearce* for evidence. Defendants compounded this denial of Plaintiff's rights by fabricating the evidence utilized to create the illegal search and seizure of Plaintiff.

221. As alleged, when defendants' adherence to due process procedures resulted in defendants' inability to revoke Plaintiff's chiropractic license for committing sexual misconduct, Defendants overwhelmed the protections of due process and fair court procedure by revoking Plaintiff's license for acts and attitude not charged and for attitude and acts for which no discipline is allowed under the law.

222. As alleged, defendants' conduct resulted in the appearance of a fair trial when, in actuality, Plaintiff was deprived of the cornerstone of fairness in trials: the ability to confront his accusers and the ability to present himself as a credible witness in his own defense. This was demonstrated by the Chiropractic Board finding complaining witnesses uncorroborated testimony of events long past more credible than Plaintiff's records and corroborating witnesses' testimony and Board's admittedly incompetent expert being found more credible than the plethora of Plaintiff's experts whose competence was unchallenged.

223. In short, Defendants' actions reduced Plaintiff's trial to a show trial of procedure in which Plaintiff's loss of his license was foreordained before trial.

224. As a direct and proximate result of defendants' conduct, Plaintiff was subjected to the humiliation of being coerced by the state into acquiescing to assault and battery upon his person. As a further direct and proximate result of defendants' conduct plaintiff was injured in his liberty and property interests, including but not limited to loss of income, his business, his right to practice his profession, investment opportunity, and his future earning capacity in an amount

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

according to proof.  As a further direct and proximate result of defendants' conduct alleged herein, Plaintiff was injured in his health in an amount according to proof.  As a further direct and proximate result of Defendants' conduct plaintiff incurred general damages in an amount according to proof.

225.  The conduct of defendants was fraudulent, malicious and oppressive.  Plaintiff requests punitive damages.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

**TWENTY-SIXTH CLAIM FOR DAMAGES FOR VIOLATION OF**
**42 U.S.C. 1986 BY CHIROPRACTIC BOARD MEMBERS;**
**BENNET; MEADOWS; AND HERSH**

226.  Plaintiff realleges and incorporates paragraphs one through 95,  as if fully set forth.

227.  Chiropractic Board Members, Bennet, Meadows, and Hersh were all supervisors who were aware of the conspiracy pled in the Twenty-Fifth Claim for Damages herein.  By not abating the conspiracy, these defendants violated 42 U.S.C. 1986.

228.  As a direct and proximate result of defendants failure to abate the conspiracy, Plaintiff suffered special and general damages in an amount according to proof.

229.  Defendants' actions and inaction was fraudulent, malicious, and oppressive.  Accordingly, Plaintiff is entitled to punitive damages.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

**TWENTY-SEVENTH CLAIM FOR DAMAGES FOR VIOLATION**
**OF 42 U.S.C. 1983 BY ROMEO, MEADOWS AND MERCER**

230.  Plaintiff realleges and incorporates paragraph 79, 81, 82, and 83 as if fully set forth.

231.  As alleged, Defendants Meadows and Mercer solicited and obtained

**59**

---

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

fabricated evidence from Defendant Berman for use in prosecuting Plaintiff in Acupuncture Board v. Pearce.

232. At the time these defendants engaged in this conduct, the law was well settled that such conduct was a violation of 42 U.S.C. 1983.

233. As a direct and proximate result of defendants' actions, Plaintiff was forced to defend himself against an action against his Acupuncture license. This caused him to suffer special and general damages according to proof.

234. Defendants' actions and inaction were fraudulent, malicious, and oppressive. Accordingly, Plaintiff is entitled to punitive damages.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

## TWENTY-EIGHTH CLAIM FOR DAMAGES AGAINST BERMAN
## FOR VIOLATION OF 42 U.S.C. 1983

235. Plaintiff realleges and incorporates Paragraphs 81, 82, 83, 91, and 93, as if fully set forth.

236. As alleged, Berman agreed to and did fabricate evidence against Plaintiff for use against Plaintiff in an accusation against Plaintiff's Acupuncture License.

237. At the time Berman fabricated his evidence, the law was well settled that such fabrication was a violation of 42 U.S.C. 1983.

238. As a direct and proximate result of Berman's conduct, Plaintiff was forced to incur expenses to defend his ability to practice Acupuncture. As a further direct and proximate result of said conduct, Plaintiff suffered special and general damages in an amount according to proof.

239. Defendants conduct as alleged herein was fraudulent, malicious and oppressive. Hence, Plaintiff is entitled to punitive damages in an amount to be determined by jury.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

## TWENTY-NINTH CLAIM FOR DAMAGES AGAINST BERMAN, MERCER, AND MEADOWS FOR VIOLATION OF 42 U.S.C. 1985.

240.   Plaintiff realleges and incorporates paragraphs 81, 82, 83, 91, and 93, as if fully set forth.

241.   As alleged, said conduct constitutes a violation of 42 U.S.C. 1985.

242.   As a direct and proximate result of the conspiracy alleged herein, Plaintiff suffered special and general damages according to proof.

243.   Defendants' actions were fraudulent, malicious, and oppressive. Accordingly, Plaintiff is entitled to punitive damages.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

## THIRTIETH CLAIM FOR DAMAGES AGAINST BERMAN FOR MALICIOUS PROSECUTION

244.   Plaintiff realleges and incorporates paragraphs 81, 82,  88, 91, and 93,as if fully set forth.

245.   As alleged, Berman stated within his report that he had relied heavily on the Everstine's report as a valid and truthful source of information upon which he based his diagnosis of Dr.  Pearce.  By the fall of 2001, he had been informed by the Everstines and by Attorney Ed Cullen, the attorney responsible for presenting the Everstine's report in the hearing on Alexander's request for injunction, that the report had no intrinsic value.  In addition, he was informed that the Santa Clara Superior Court found the report inadequate as evidence upon which to base an injunction.  Yet, faced with this revelation that his examination of Dr.  Pearce had occurred without probable cause and his conclusions were based in substantial portion on a report without intrinsic value, Berman refused to re-evaluate his conclusions.   Instead, he decided to lie in testimony by claiming he had not considered the Everstine report in coming to his conclusions

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

about Dr. Pearce. Given that he had been informed that his conclusions could not be supported by the Everstine report and knowing that his own testing did not support his conclusions, he had been informed that his accusation that Dr. Pearce was too mentally ill, and would be so for life, to safely practice his profession, he persisted in participating in prosecuting Dr. Pearce. At this point, Berman did not intend to assist the Acupuncture Board in evaluating Dr. Pearce's fitness to practice Acupuncture, instead he was intent on violating 42 U.S.C. 1983 so as to assist AG defendants in covering up their misdeeds in *Chiropractic Board v. Pearce* and preventing Dr. Pearce from being able to recover damages for said activities.

246. As a direct and proximate cause of Berman's conduct, Plaintiff suffered special and general damages in an amount according to proof.

247. Defendant's conduct was fraudulent, malicious, and oppressive. Accordingly, Plaintiff is entitled to punitive damages.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

**THIRTY-FIRST CLAIM FOR DAMAGES AGAINST HERSH FOR**

**VIOLATION OF 42 U.S.C. 1986.**

248. Plaintiff realleges and incorporates paragraphs one through 95, as if fully set forth.

249. Defendant Hersh was Romeo's, Mercer's and Meadows' supervisor. She failed to take any action to abate the conspiracy. Her failure to abate the conspiracy is a violation of 42 U.S.C. 1986. Her failure to take any action to abate the conspiracy was a manifestation of her callous indifference to the rights of Plaintiff and those similarly situated.

250. As a direct and proximate cause of defendant's action and inaction, Plaintiff suffered special and general damages in an amount according to proof.

251. Defendant's actions and inaction was malicious, and oppressive.

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

Accordingly, Plaintiff is entitled to punitive damages.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

## THIRTY-SECOND CLAIM FOR DAMAGES AGAINST ALL
## DEFENDANTS FOR VIOLATION OF 42 U.S.C. 1985

252.  Plaintiff realleges and incorporates all previous paragraphs.  As alleged, the defendants herein engaged in a series of agreements which overlapped in membership, purpose, and in activities and which were united in one common goal of destroying Plaintiff's professional life.  As such, the activities of all defendants named herein constituted a single agreement, purpose, and course of conduct aimed at destroying Plaintiff's professional life.  This was in violation of 42 U.S.C. 1985.

253.  As a direct and proximate result of the conspiracy, Plaintiff suffered special and general damages in an amount according to proof.

254.  The activities of the conspirators were fraudulent, malicious, and oppressive.  Hence, Plaintiff is entitled to punitive and exemplary damages in an amount to be determined by the jury.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

## THIRTY THIRD CLAIM FOR DAMAGES AGAINST BENNET
## AND HERSH FOR VIOLATION OF 18 U.S.C. 1986

255.  Plaintiff realleges and incorporates all previous paragraphs.  As alleged, these defendants were supervising Deputy Attorney Generals who had a duty to abate the conspiracy their subordinates, Romeo, Meadows, and Mercer engaged in.  Instead of abating their activities, they did nothing.  Their decision to not abate the wrongful activities of their subordinates was borne of their callous indifference to Plaintiff's rights and those similarly situated.  As a result of their inaction and actions, Plaintiff suffered special and general damages according to proof.

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

256.  Defendants' inaction, being born of said callous indifference was malicious and oppressive.  Hence, Plaintiff is entitled to punitive and exemplary damages in an amount to be decided by jury.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

/

/

## THIRTY-FOURTH CLAIM FOR DAMAGES AGAINST STUART, LOVE, LEVIN, GUY, FULTON, YONTS, YONTS & FULTON AND ALEXANDER FOR RICO ACTIVITIES

257.  Plaintiff realleges and incorporates paragraphs one through 95.

258.  As alleged, these defendants in this claim associated together to carry out a plan to defraud Stuarts' workers' compensation carrier and to cover up their fraud by causing Plaintiff to be prosecuted for crimes and allegations he did not commit.  They utilized the mails to cover up the insurance fraud of Stuart. For example, on October 04, 1991, to carry out their fraud, Guy caused a letter to be sent through the United States mails to the California State Board of Chiropractic Examiners falsely accusing him of patient molestation and battery. On June 05, and 12, 1995, Alexander caused to be sent through the United States mails, letters which accused Plaintiff of these same crimes plus obstructing justice in *Machado v. Pearce*.  Said defendants also contemplated and expected that the mailings and other activities they committed in their quest to have Plaintiff prosecuted by the Chiropractic Board would result in use of the mails by the Chiropractic Board.  Said defendants also utilized the mails on dozens of occasions to send bills for services utilized by Stuart in the course of making her false claims to her workers' compensation carrier.  Said defendants contemplated and expected the carrier to utilize the mails to pay for the bills for services.  These activities constitute a pattern and practice of utilizing the mails

---

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

to commit fraud, a violation of 18 U.S.C. 1341 by an association in fact.

259. As alleged, this associations' enterprise involving mail fraud is prohibited by 18 U.S.C. (b),(c), and (d). The enterprise and pattern of fraud caused injury to Plaintiff's business and property in an amount according to proof. Thus, Plaintiff brings this complaint under 18 U.S.C. 1964(c) for recovery of treble his damages, attorneys fees associated with this lawsuit and costs of this lawsuit.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

### THIRTY-FIFTH CLAIM FOR DAMAGES AGAINST SHARP, SULLIVAN, AND CHIROPRACTIC BOARD OFFICERS FOR DAMAGES FROM RICO ACTIVITIES

260. Plaintiff realleges and incorporates paragraphs one through 69, and 88 through 90 herein as if fully set forth.

261. As alleged, said defendants entered into an agreement to damage plaintiff in his business, his property interest in maintaining his right to practice his profession, and his property and carried out said agreement by soliciting fabricated evidence against Plaintiff by defendant Sullivan. On March 29, 1992, defendant Sharp utilized the United States mails to send Sullivan materials upon which to base his fabricated evidence. March 29, 1992, Sullivan utilized the United States Mails to Board officers his fabricated evidence. Thereafter, the board officers and Sullivan utilized the United States mails to pay Sullivan for his time in creating his fabricated evidence. Board members contemplated and expected the use of the mails by both themselves and Plaintiff in the course of utilizing their fabricated evidence against Plaintiff. These activities constitute a pattern of use of the mails to defraud Plaintiff of his property interests and were in violation of 18 U.S.C. 1341. Said defendants are prohibited from participating in such activity by 18 U.S.C. 1962(b)(c) and (d).

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

262.   As alleged, Plaintiff was injured in his property interests, his business and his property.  Thus, Plaintiff brings this complaint under 18 U.S.C. 1964(c) for recovery of treble his damages, attorneys fees associated with this lawsuit and costs of this lawsuit.

Wherefore, Plaintiff prays for judgment as hereinafter set forth.

/

## THIRTY-SIXTH CLAIM FOR DAMAGES AGAINST BOTHA AND ALEXANDER FOR DAMAGES FROM RICO ACTIVITIES

263.   Plaintiff realleges and incorporates paragraphs one through 95, herein as if fully set forth.

264.   As alleged, Alexander hired Botha to assist him in defending against Plaintiff's lawsuits.  Alexander and Botha agreed to conduct their defense by suborning perjury from Thomas Hogan and by relying upon perjury committed by Alexander in *Chiropractic Board v. Pearce* and by  Botha in defending against Plaintiff's lawsuits against Alexander.  As alleged in paragraph 68, Alexander did suborn Thomas Hogan to testify that he had settled Alexander's lawsuit against Plaintiff with Plaintiff's knowledge, consent, and authority.  On April 08, 1999, Botha caused a copy of Hogan's perjured affidavit to be delivered through the United States Mails to Plaintiff and others.  As alleged in paragraphs 63, and 64 Alexander did commit perjury before the Chiropractic Board in *Chiropractic Board v. Pearce*.  On August 26, 1999, Botha committed perjury in *Pearce v.  Machado* and *Pearce v.  Alexander* by testifying to having spent twice the amount of money on costs than actually spent in defending each case.  On August 27, 1999, Botha caused her perjured affidavit to be delivered through the United States mails to Plaintiff. On or after October 18, 1999, Botha committed further perjury in *Machado v.  Pearce* by claiming, under oath that Plaintiff had failed to follow a court order to pay sanctions.  On October 21, 1999, Botha caused her

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

perjured affidavit to be delivered by mail to Plaintiff.

265. As alleged in paragraph 70, on September 02, 1999, Botha telephoned Plaintiff and threatened to arrange for him to be physically injured if he exposed any of her perjuries in open court. To cover up this threat and their perjuries, Botha and Alexander arranged for two psychologists to create a bogus report claiming Plaintiff was delusional, paranoid, and narcissistic. They then utilized this report to obtain a TRO against plaintiff. As alleged in paragraph 75 the threat and bogus TRO did succeed in deterring Plaintiff from exposing Botha's perjury successfully utilized in a motion to deprive Plaintiff of his ability to present evidence in his *Pearce v. Machado* lawsuit against Alexander.

266. Alexander then utilized the existence of the bogus report and TRO, in violation of a court order, to initiate investigation and prosecution of Plaintiff by the Acupuncture Board. Then, Alexander utilized the investigation and prosecution to coerce and intimidate Plaintiff into accepting an unfavorable settlement of his lawsuits against Alexander.

267. As alleged herein, Botha's conduct was in violation of 18 U.S.C. sections 1512(b) and 1513(b) and 18 U.S.C. 1341. As alleged, Plaintiff was engaged in interstate commerce at the time these offenses against him occurred. Thus, Botha's conduct violated 18 U.S.C. 1962(c) and (d). As a result of these activities, Plaintiff was injured in his business, his property interest to practice his profession and his property. Accordingly, he is authorized by 18 U.S.C. 1964(c) to bring this claim for relief against Botha and Alexander and to collect treble his damages, his attorneys fees associated with bringing this suit and costs of suit..

268. Wherefore, Plaintiff prays for relief as hereinafter set forth.

## PRAYER

Plaintiff prays for judgment as follows:

A. Against all tortfeasors jointly and severally for all claims for damages

**67**

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

arising from malicious prosecution:

    a    Special damages for:

        i.    Attorneys fees and costs spent on defending against the malicious prosecutions;

        ii.    Costs and interests associated with financing attorneys fees and costs on defending against the malicious prosecutions

        iii.    Loss of business income, loss of business, loss of property, loss of property interests, loss of license

        iv.    Medical expenses for physical injuries

        v.    Medical expenses for treatment for stress

        vi.    Loss of economic relationships and advantages;

        vii.    Loss of investment and economic opportunities;

        viii.    Loss of business goodwill;

        ix.    Loss of ability to publish research;

        x.    Loss of teaching income;

        xi.    Time unpaid due to having to defend against the tortfeasors' actions; and

        xii.    Such other special damages as are proved at trial

    b    General damages for

        i.    Humiliation, embarrassment, mortification, fright,

        ii.    Loss of reputation, standing in the community;

        iii.    Loss of enjoyment;

        iv.    Interpersonal stress;

        v.    Stress; and

        vi.    Such other damages as determined by a jury

B.    For all claims for damages for violation of Plaintiff's Civil Rights against all tortfeasors jointly and severally:

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

a    Special damages for:

    i.    Attorneys fees and costs spent on defending against the actions of tortfeasors;

    ii.    Costs and interests associated with financing attorneys fees and costs on defending against the malicious prosecutions

    iii.    Loss of business income, loss of business, loss of property, loss of property interests, loss of license

    iv.    Medical expenses for physical injuries

    v.    Medical expenses for treatment for stress

    vi.    Loss of economic relationships and advantages;

    vii.    Loss of investment and economic opportunities;

    viii.    Loss of business goodwill;

    ix.    Loss of ability to publish research;

    x.    Loss of teaching income;

    xi.    Time unpaid due to having to defend against the tortfeasors' actions; and

    xii.    Such other special damages as are proved at trial

b    General damages for

    i.    Humiliation, embarrassment, mortification, fright,

    ii.    Loss of reputation, standing in the community;

    iii.    Loss of enjoyment;

    iv.    Interpersonal stress;

    v.    Stress; and

    vi.    Such other damages as determined by a jury

c    Attorneys fees in this action as determined by the court

C    For all claims for damages arising from violation of the California Statutes jointly and severally against all tortfeasors:

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

    a    Special damages for:

        i.    Attorneys fees and costs spent on defending against the actions for the tortfeasors;

        ii.    Costs and interests associated with financing attorneys fees and costs on defending against the malicious prosecutions

        iii.    Loss of business income, loss of business, loss of property, loss of property interests, loss of license

        iv.    Medical expenses for physical injuries

        v.    Medical expenses for treatment for stress

        vi.    Loss of economic relationships and advantages;

        vii.    Loss of investment and economic opportunities;

        viii.    Loss of business goodwill;

        ix.    Loss of ability to publish research;

        x.    Loss of teaching income;

        xi.    Time unpaid due to having to defend against the tortfeasors' actions; and

        xii.    Such other special damages as are proved at trial

    b    General damages for

        i.    Humiliation, embarrassment, mortification, fright,

        ii.    Loss of reputation, standing in the community;

        iii.    Loss of enjoyment;

        iv.    Interpersonal stress;

        v.    Stress; and

        vi.    Such other damages as determined by a jury

    c    Attorneys fees in this action as determined by the court

    d    Civil Fines against each tortfeasor as authorized by statute

D    For all claims for damages for assault and battery, against all tortfeasors

**70**

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

jointly and severally, special and general damages according to proof

E    For all claims for damages for RICO violations, against all tortfeasors jointly and severally,:

    a    All damages to plaintiff's business, property, and property interests according to proof to a jury, trebled;

    b    Attorneys fees and costs of suit as determined by the court;

F    For all claims for damages not arising from RICO violations, against all tortfeasors jointly and severally:  Punitive and exemplary damages as determined by the jury or, as the cause requires, by the court;

G    For all claims for damages against all tortfeasors jointly and severally:

    a    Costs of Suit

    b    Such other damages as the jury or as the cause requires, the court, deems just and proper in the premises.

    c    Such other relief as the court deems just and proper in the premises

Plaintiff estimates that special damages exceed $6,000,000.00 before trebling.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.

Dated:  August 19, 2002    _____

M. VAN SMITH
Attorney for Plaintiff

### VERIFICATION OF COMPLAINT FOR DAMAGES

I, Mitchell J.  Pearce, D.C., M.S., L.Ac. certify under penalty of perjury under the laws of the United States of America that I am the plaintiff in this action, that I have read this complaint, and that, to the best of my knowledge, information, and belief, the allegations are true and correct, and that this complaint is not interposed for delay or other improper purposes.

**71**

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

Executed at San Jose, California on August 19, 2002.

.

_____

Mitchell J.  Pearce, D.C., M.S., L.Ac.

**COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**